PETER C. ANDERSON
UNITED STATES TRUSTEE
JILL M. STURTEVANT
ASSISTANT UNITED STATES TRUSTEE
MELANIE C. SCOTT, STATE BAR NO. 234646
TRIAL ATTORNEY
OFFICE OF THE UNITED STATES TRUSTEE
725 So. Figueroa Street, Suite 2600
Los Angeles, California 90017
(213) 894-7244 Telephone
(213) 894-2603 Facsimile
*Melanie.Scott@usdoj.gov*

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case Number 2:09-bk-42300-TD |
| **BH MALL, LLC,** | Chapter 11 |
| Debtor. | **MOTION TO DISMISS DEBTOR'S CHAPTER 11 BANKRUPTCY CASE OR, IN THE ALTERNATIVE, CONVERT TO CHAPTER 7; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF JACK ARUTYUNYAN AND SAM LOR IN SUPPORT THEREOF** |
| | DATE: [To be Set] |
| | TIME: [To be Set] |
| | CTRM: 1345 |
| | 255 E. Temple Street |
| | Los Angeles, CA 90017 |

**TO THE HONORABLE THOMAS B. DONOVAN, UNITED STATES BANKRUPTCY JUDGE, DEBTOR, DEBTOR'S ATTORNEY, AND TO ALL INTERESTED PARTIES:**

Peter C. Anderson, the United States Trustee for Region 16, hereby moves this Court for an order dismissing the above captioned Chapter 11 case of BH Mall, LLC ("Debtor") or, in the alternative, converting it to Chapter 7. This Motion is filed pursuant to Bankruptcy Rule 9013 and Local Bankruptcy Rule 9013-1.

# I. INTRODUCTION

During the twenty months since this case has been pending, Debtor - the owner and operator of East Hills Mall in Bakersfield, California - has never proposed a plan of reorganization, and there is currently no plan or disclosure statement on file for this Court's consideration.[1] Additionally, Debtor has repeatedly failed to timely file monthly operating reports ("MORs") with this Court as required by the Local Bankruptcy Rules and the United States Trustee's Notices and Guides, and has filed incomplete reports. *See* Declaration of Jack Arutyunyan ("Arutyunyan Declaration") filed concurrently herewith at ¶ 4. From the MORs that Debtor has filed and appear on this Court's docket as of July 27, 2011, as well as the June 2011 MOR (which does not appear on the Court's docket but was apparently hand-filed), it is apparent that over the life of its bankruptcy case, Debtor has experienced a net loss of at least $243,462.91. *Id.* at ¶ 6. In its February 2011 and June 2011 MORs, Debtor also reports payments totaling $6,000 to an accountant, yet Debtor has never sought this Court's authority to retain, let alone pay, an accountant as required by the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules. *Id.* at ¶ 9. In its June 2011 MOR, Debtor also indicates that both its general liability and worker's compensation insurance have expired. *Id.* at ¶ 10. Moreover, Debtor owes quarterly fees for the first and second quarters of this year. *See* Declaration of Sam Lor ("Lor Declaration") filed concurrently herewith at ¶ 2. Since Debtor is (a) continually losing money, (b) has failed to comply with the reporting requirements of the Local Bankruptcy Rules and Notices and Guides of the United States Trustee, (c) has failed to pay its quarterly fees, (d) has paid a professional without first seeking this Court's approval of the professional's retention and authorization to pay the professional, (e) has failed to maintain current insurance, and (f) has been given more than enough time to pursue its case to no avail, the UST submits that cause

---

1    The United States Trustee respectfully requests that the Court take judicial notice of its own docket in this case, Debtor's petition, schedules, statement of financial affairs and other documents filed therewith and any amendments thereto which are in the Court's files, pursuant to Fed. R. Evid. 201, as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9017. The information contained in these documents, signed under penalty of perjury by Debtor, are admissible admissions of the Debtor pursuant to Fed. R. Evid. 801(d).

1  exists to dismiss or, in the alternative, convert this case.

2

3                                    **II.    STATEMENT OF FACTS**

4          Debtor filed a voluntary petition under chapter 11 on November 17, 2009. Since the

5  filing of the chapter 11 petition, Debtor has remained a debtor-in-possession. However, at no

6  point has Debtor filed a plan or disclosure statement.[2] Moreover, a review of the docket for the

7  instant case reflects that only 9 of the 20 required MORs appear on the Court's docket as having

8  been filed as of July 27, 2011. Identified below are the MORs that appear as filed on the Court's

9  docket as of July 27, 2011 and the MORs which are missing to date

| **MORs Filed** | **MORs Missing** |
| --- | --- |
| PE 01/31/2010 | PE 11/30/2009 |
| PE 05/31/2010 | PE 12/31/2009 |
| PE 07/31/2010 | PE 02/28/2010 |
| PE 09/30/2010 | PE 03/31/2010 |
| PE 10/31/2010 | PE 04/30/2010 |
| PE 11/30/2010 | PE 06/30/2010 |
| PE 12/31/2010 | PE 08/31/2010 |
| PE 02/28/2011 | PE 01/31/2011 |
| PE 04/30/2011 | PE 03/31/2011 |
| | PE 05/31/2011 |
| | PE 06/30/2011[3] |

22  *See* Arutyunyan Declaration at ¶4. Moreover, some of the MORs Debtor has filed have been

23  incomplete. *See id.*

24

25

26  2    The only plan and disclosure statement that were filed in this case were filed by secured creditors
    Albert Cohen and the Albert Cohen Family Trust. *See* Docket Nos. 93-94.

27

28  3    The June 2011 MOR was apparently filed with the Bankruptcy Court by hand, but as of July 27, 2011, it
    does not appear on the Court's docket.

An analysis of the MORs that appear on this Court's docket as having been filed as of June 27, 2011, as well as the June 2011 MOR, reveals that Debtor's total reported revenue was $1,290,705.59, operating expenses were $1,181,331.81 and non-operating expenses were $479,967.05, yielding a reported cumulative net Loss of $243,462.91. *Id.* at ¶6.

In its February 2011 and June 2011 MORs, Debtor also reports the following payments totaling $6,000:

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 02/22/11 | Chaim Aaron Levin CPA | Bookkeeping & Accounting | $2,000 |
| 6/20/11 | Chaim Aaron Levin CPA | Accounting | $2,000 |
| 6/20/11 | Chaim Aaron Levin CPA | Accounting | $2,000[4] |

*Id. at* ¶ 9. The Debtor, however, has not filed an application to employ an accountant at any juncture in this case. *Id.* Moreover, this accountant has not filed an application seeking Court approval of its fees. *Id.*

In its June 2011 MOR, Debtor also indicates that its insurance has expired, as follows:

| Nature of Insurance | Carrier | Amount of Coverage | Expiration Date |
|---------------------|---------|--------------------|-----------------|
| General Liability | Travelers | $50,000,000 | 1/31/2011 |
| Worker's Compensation | Paychex | | 6/30/2011 |

*Id.* at ¶ 10.

As of today's date, there is no chapter 11 plan or disclosure statement on file and it is apparent that Debtor has not made any progress toward the filing of a plan.

As of today's date, Debtor owes the United States Trustee an estimated amount of quarterly fees totaling $3,250 for the first and second quarters of 2011. *See* Lor Declaration at ¶2.

---

4    Relevant pages of the February 2011 and June 2011 MORs are attached to the Arutyunyan Declaration as Exhibits 7 and 8.

1

### III.    ARGUMENT

2    **A.    CAUSE EXISTS TO DISMISS OR CONVERT DEBTOR'S CASE UNDER 11**

3    **U.S.C. §1112(b)(1) and (b)(4)**

4    Cause exists to dismiss Debtor's case or, in the alternative, convert the case to Chapter 7

5    pursuant to 11 U.S.C. § 1112(b)(1) because Debtor has failed to comply with the Local

6    Bankruptcy Rules and the United States Trustee's reporting requirements, has failed to pay the

7    requisite quarterly fees, has experienced a continuing loss of cash flow throughout the duration of

8    this case and has no reasonable likelihood of rehabilitation.

9    Section 1112(b)(1) provides that:

10    Except as provided in paragraph (2) and subsection (c) of section 1112 of the
      Bankruptcy Code, on request of a party in interest, and after notice and a
11    hearing, the court shall convert a case under this chapter to a case under
      chapter 7 or dismiss a case under this chapter, whichever is in the best
12    interests of creditors and the estate, for cause unless the court determines that
      the appointment under section 1104(a) of a trustee or an examiner is in the
13    best interests of creditors and the estate.

14    *11 U.S.C. § 1112(b)(1).* Moreover, as set forth in section 1112(b)(4):

15    For the purposes of this subsection, the term "cause" includes- (A) substantial
      or continuing loss to or diminution of the estate and the absence of a
16    reasonable likelihood of rehabilitation; (B) gross mismanagement of the
      estate; (c) failure to maintain appropriate insurance that poses a risk to the
17    estate or to the public; (D) unauthorized use of cash collateral substantially
      harmful to 1 or more creditors; (E) failure to comply with an order of the
18    court; (F) unexcused failure to satisfy timely any filing or reporting
      requirement established by this title or by any rule applicable to a case under
19    this chapter; (G) failure to attend the meeting of creditors convened under
      section 341(a) or an examination ordered under rule 2004 of the Federal Rules
20    of Bankruptcy Procedure without good cause shown by the debtor; (H) failure
      timely to provide information or attend meetings reasonably requested by the
21    United States Trustee (or the bankruptcy administrator, if any); (I) failure
      timely to pay taxes owed after the date of the order for relief or to file tax
22    returns due after the date of the order for relief; (J) failure to file a disclosure
      statement, or to file or confirm a plan, within the time fixed by this title or by
23    order of the court; (K) failure to pay any fees or charges required under
      chapter 123 of title 28; (L) revocation of an order of confirmation under
24    section 1144 of this title; (M) inability to effectuate substantial consummation
      of a confirmed plan; (N) material default by the debtor with respect to a
25    confirmed plan; (O) termination of a confirmed plan by reason of the
      occurrence of a condition specified in the plan; and (P) failure of the debtor to
26    pay any domestic support obligation that first becomes payable after the date
      of the filing of the petition.

27

28    *11 U.S.C. § 1112(b)(4).* "The bankruptcy court has wide discretion to determine whether cause

1   exists under § 1112(b), and under its equitable powers, it may consider factors other than those

2   listed in § 1112(b)." *In re Sparks Dirt Project*, 1994 WL 19012, 2 (9th Cir. 1994) (unpublished)[5]

3   (citing *In re Reichert,* 138 B.R. 522 (Bankr. W.D. Mich. 1992)); *see also In re J and D*

4   *Equipment Rentals, Inc.*, 1999 WL 639188, \*2  (9th Cir. 1999) (unpublished);[6] *Pioneer*

5   *Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities)*, 264 F.3d 803, 806-07

6   (9th Cir. 2001). Ultimately "when deciding between dismissal and conversion under 11 U.S.C. §

7   1112(b), 'the court must consider the interests of *all* of the creditors.'" *In re Owens (Hutton v.*

8   *Owens, et al.)*, 552 F.3d 958, 961 (9th Cir. 2009) (citing *Rollex Corp. v. Associated Materials,*

9   *Inc. (In re Superior Siding & Window, Inc.*), 14 F.3d 240, 243 (4th Cir. 1994) (emphasis in

10  original)).

 

11
12
13

       **1.**    **Debtor's Failure to Comply With the Reporting Requirements of the United**
             **States Trustee and Local Bankruptcy Rules is Cause for Dismissal or**
             **Conversion of Debtor's Case Under 11 U.S.C. § 1112(b)(1) and (b)(4)(F).**

14
15
16
17

     Pursuant to section 1112(b)(1) and (b)(4)(F), a court may dismiss or convert a case for

cause where a debtor has experienced an "unexcused failure to satisfy timely any filing or

reporting requirement established by this title or by any rule applicable to a case under this

chapter." 11 U.S.C. § 1112(b)(1) and (b)(4)(F).

18
19
20
21
22
23
24
25

     Local Bankruptcy Rule ("LBR") 2015-2(a)(1) for the United States Bankruptcy Court for

the Central District of California requires debtors in possession or chapter 11 trustees to "provide

the United States Trustee with financial, management and operational reports, and such other

information as requested by the United States Trustee . . . pursuant to the United States Trustee

Notices and Guides". Additionally, LBR 2015-2(c)(1) provides that a "debtor in possession or

chapter 11 trustee must file with the court a copy of each monthly interim statement or operating

report submitted to the United States trustee from the date the chapter 11 case is commenced

26

27   5   A copy of this unpublished decision is attached hereto as Exhibit A.

28   6   A copy of this unpublished decision is attached hereto as Exhibit B.

1  until the date a plan is confirmed or the case is dismissed or converted to another chapter under

2  title 11." LBR 2015-2(c)(2) also provides that "[e]ach interim statement and operating report

3  must be filed on the date that such documents are submitted to the United States trustee, but not

4  later than the 15th day of the month following expiration of the month which is the subject of the

5  statement or report." Lastly, LBR 2015-2(b) provides that timely compliance with the reasonable

6  requirements of the Office of the United States Trustee is <u>mandatory</u>.

7  Additionally, the "Notice of Financial Reporting Requirements for Chapter 11 Debtors in

8  Possession" issued by the United States Trustee for Region 16 provides that "MOR's must be

9  completed on a calendar monthly basis (unless modified in writing by the OUST) and must be

10  submitted within 15 days after the last day of each month." Arutyunyan Declaration, Exhibit 1.

11  The Notice of Financial Reporting Requirements also provides that "[f]ailure to submit MOR's

12  to the United States Trustee in a timely fashion may result in a motion to convert or dismiss the

13  bankruptcy." *Id.*

14  It is well-established that failure to comply with the reporting requirements of the United

15  States Trustee and the Local Bankruptcy Rules is cause to dismiss a chapter 11 case or convert it

16  to one under chapter 7. *See In re 3868-70 White Plains Road Inc.*, 28 B.R. 515, 519 (Bankr.

17  S.D.N.Y. 1983); *In re Bianco,* 5 B.R. 466, 468 (Bank. D. Mass.1980); *In re Pappas,* 17 B.R.

18  662, 668 (Bankr. D. Mass. 1982); *In re Stokes*, 2009 WL 3062314, *18 (Bankr. D. Mont. 2009)

19  (unpublished).[7]

20  In this case, Debtor is required by LBR 2015-2(a)(1) and (c) to provide to the United

21  States Trustee and file with the Bankruptcy Court, on a monthly basis, MORs that completely

22  and accurately reflect Debtor's current monthly financial situation. However, during the twenty

23  months that this case has been pending, Debtor has failed to timely submit and/or file numerous

24  MORs. *See* Arutyunyan Declaration, ¶ 4. Morever, Debtor has also filed incomplete MORs. *Id.*

25  Local Bankruptcy Rule 2015-2(b) states that a debtor in possession shall comply with the

26

27

28  7    A copy of this unpublished decision is attached hereto as Exhibit C.

1 reasonable requirements of the United States trustee with respect to form, maintenance of

2 records, and reporting requirements as set forth in the United States trustee's Notices and Guides.

3 The United States trustee's Notice of Financial Reporting Requirements for Chapter 11 Debtors

4 in Possession states that the submission of incomplete reports will be treated as if the Debtor

5 failed to submit those reports. *Id.*, Exhibit 1. As such, Debtor's "failure timely to provide

6 information . . . reasonably requested by the United States trustee," 11 U.S.C. § 1112(b)(2)(F),

7 constitutes "cause," the finding of which requires the Court to convert or dismiss a case. 11

8 U.S.C. § 1112(b)(1).[8]

9        **2.    Cause Exists to Dismiss or Convert Debtor's Case Under 11 U.S.C.**

10              **1112(b)(1), (b)(4)(A) and (b)(4)(J) Because Debtor's Estate Is Experiencing a**

11              **Substantial, Continuing Loss, There is No Reasonable Likelihood of**

12              **Rehabilitation and Debtor Has Failed To File and Confirm a Plan**.

13        Pursuant to section 1112(b)(1) and (b)(4)(A), a court may dismiss or convert a case for

14 cause where a debtor has experienced a "substantial or continuing loss to or diminution of the

15 estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(1) and

16 (b)(4)(A). Moreover, a court may dismiss or convert a case for cause where a debtor has failed to

17 "file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by

18 order of the court." 11 U.S.C. § 1112(b)(4)(J). It is clear that a court may convert or dismiss a

19 case where no reasonable possibility of effective reorganization exists, the debtor is unable to

20 effectuate a plan and/or for unreasonable delay which prejudices the rights of creditors. *See e.g.,*

21 *In re Johnson*, 149 Bankr. 158, 161 (9th Cir. BAP 1992); *In re Products Intern. Co.*, 395 B.R.

22 101, 110 (Bankr. D. Ariz. 2008); *In re Wallace*, 2011 WL 1230535, *2 (D. Idaho 2001) (slip

---

8    The UST Notices and Guides also provide that payment of quarterly fees is required. Yet,
26 Debtor has failed to pay its quarterly fees. As set forth in the Lor Declaration, the Debtor owes an
estimated amount of quarterly fees totaling $3,250. *See* Lor Declaration, ¶ 2. Furthermore, although
27 LBR 2014-1, Bankruptcy Rule 2014 and 11 U.S.C. § 327 require that Debtor seek this Court's approval
of the employment of all professionals, including the accountant Debtor has utilized herein, Debtor has
28 failed to comport with these rules.

1  copy).[9]  Indeed, "[c]ourts have used § 1112(b) to dismiss cases when debtors have no ongoing

2  business operations and no structure of assets. *See, e.g., In re Anderson,* 52 B.R. 159, 163

3  (Bankr. D. N.D. 1985) (dismissal warranted under § 1112(b)(2) when debtor after two years of

4  bankruptcy was still unable to confirm a plan); *In re Ellison Assocs.,* 63 B.R. 756, 766 (Bankr.

5  S.D.N.Y. 1983) ('Inasmuch as debtor had no assets, it is unlikely to form an effective plan of

6  rehabilitation[,]' which warrants dismissal under § 1112(b)(1) and (2).); *In re Eden Assocs.,* 13

7  B.R. 578, 584 (Bankr. S.D.N.Y. 1981) (debtor's 'only alleged asset is this property, [and debtor]

8  has no other real creditors and no employees; who has, in short, no ongoing business to

9  reorganize')." *Sparks Dirt Project*, 1994 WL 19012, 2.  Other courts have held that dismissal of

10  a case is warranted where the debtor, after a prolonged period of time, has failed to confirm a

11  plan. *See In re Haines*, 2010 WL 252183, *3 (D. W.D. Wash. 2010) (upholding dismissal of a

12  case where the debtor, after being in bankruptcy for 15 months, had failed to file a disclosure

13  statement and confirm a plan) (unreported).[10]

14      In the instant case, over twenty months have passed since Debtor filed its petition and yet,

15  Debtor has never filed a plan or disclosure statement, let alone confirmed a plan.  It is apparent

16  from the MORs Debtor has filed that over the course of its case, Debtor has experienced a

17  cumulative net loss of $243,462.91. *See* Arutyunyan Declaration at ¶6.  The evidence before this

18  Court demonstrates that Debtor is continually losing money, is unable to propose and confirm a

19  plan and has no funds available to do so.  As such, the UST submits that cause exists to dismiss

20  or, in the alternative, convert this case.

21      **3.    Debtor's Failure to Maintain Current Insurance is Cause for Dismissal or**

22          **Conversion of Debtor's Case Under 11 U.S.C. § 1112(b)(1) and (b)(4)(c).**

23      Pursuant to section 1112(b)(1) and (b)(4)(c), a court may dismiss or convert a case for

24  cause where a debtor has failed to "maintain appropriate insurance that poses a risk to the estate

25  or to the public." 11 U.S.C. § 1112(b)(1) and (b)(4)(c).  "When a debtor owns real property with

26

27  9    A copy of this unpublished decision is attached hereto as Exhibit D.

28  10   A copy of this unpublished decision is attached hereto as Exhibit E.

structures, Section 1112(b)(4)(c) requires that the debtor maintain property and liability insurance

to protect the estate." *In re Van Eck*, 425 B.R. 54, 59 (Bankr. D. Conn. 2010) (citing *Gilroy v.*

*Ameriquest Mortgage Co., et al. (In re Gilroy),* 2008 WL 4531982 (1st Cir. BAP Aug. 4, 2008)

(failure to maintain property and liability insurance for five condominiums constitutes cause for

dismissal)).

Debtor's June 2011 MOR provides that the Debtor's general liability insurance with

Travelers, which policy provides coverage totaling $50,000,000, expired on January 31, 2011,

and Debtor's worker's compensation insurance with Paychex expired on June 30, 2011. *See*

Arutyunyan Declaration at ¶ 10. Considering that Debtor operates a mall frequented by members

of the general public on a daily basis, Debtor's failure to maintain current insurance is cause for

great concern and places the Debtor and the public at tremendous risk. As such, the UST

submits that Debtor's failure to maintain proper insurance constitutes cause to dismiss or convert

Debtor's case pursuant to 11 U.S.C. § 1112(b)(1) and (b)(4)(c).

## IV.

## CONCLUSION

For the reasons stated above, the United States Trustee requests this Court dismiss this

case or, in the alternative, convert it to chapter 7.

Dated: July 29, 2011                    PETER C. ANDERSON
                                        UNITED STATES TRUSTEE


                                        By:    *Melanie C. Scott*

                                               Melanie C. Scott
                                               Attorney for the United States Trustee

10

# Exhibit "A"

# Exhibit "A"

Westlaw.

15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.)))**

**C**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA9 Rule 36-3 for
rules regarding the citation of unpublished opin-
ions.)

United States Court of Appeals, Ninth Circuit.
In re SPARKS DIRT PROJECT, a Partnership,
Debtor.
SPARKS DIRT PROJECT, a Partnership, Plaintiff-
Appellant,
v.
UNITED STATES TRUSTEE; City of Sparks, De-
fendants-Appellees.

No. 92-16432.
Argued and Submitted Jan. 13, 1994.
Decided Jan. 24, 1994.

Appeal from the United States District Court for the
District of Nevada, No. CV-91-00393-ECR; Ed-
ward C. Reed, Jr., District Judge, Presiding.
D.Nev.

AFFIRMED.

Before: GOODWIN, WIGGINS, and BRUNETTI,
Circuit Judges

**MEMORANDUM** [FN*]

*1 Sparks Dirt Project ("Debtor"), a Chapter 11
debtor, purchased approximately 35.65 acres of
land which were divided into two separate parcels
of 24.1196 acres and 11.5304 acres. A couple
named Bria possessed a lien (deed of trust) on the
larger parcel, while a woman named Twaddle pos-
sessed a lien (deed of trust) on the smaller parcel.
Debtor intended to develop and resell the property.
Debtor also owned three other lots upon which
Twaddle held a deed of trust.

In 1986, the City of Sparks (the "City") im-
posed and perfected a $315,000 assessment on the
35.65 acres but did not allocate the assessment
between the 24 and 11 acre parcels. The City as-
sessed the property as a single city parcel because
Debtor owned both parcels. During the next three
years, Debtor unsuccessfully attempted to sell the
property.

Debtor's Chapter 11 bankruptcy case com-
menced on May 10, 1989. An order for relief was
entered on June 7, 1989, and the automatic stay
provisions under 11 U.S.C. § 362(a) took effect.
The Debtor has since acted as a debtor-
in-possession.

During the first year of Chapter 11, Debtor
tried but failed to sell the property. In early 1990,
the bankruptcy court granted the Bria's requested
relief from the automatic stay, and the Brias fore-
closed on the larger parcel. After the foreclosure,
Debtor owned only the smaller parcel and the three
other lots.

On June 25, 1990, to reflect the fact that after
the foreclosure different entities owned the larger
and smaller parcels, the City issued two resolutions,
whereby it would send the Brias and Debtor separ-
ate bills for assessment payments.

In August, 1990, the City moved for relief from
the automatic stay so it could foreclose on the smal-
ler parcel. Debtor did not oppose the motion. After
the bankruptcy court granted the motion, the City
foreclosed on the 11 acre parcel.

On March 5, 1991, the United States Trustee,
later joined by the City, filed a motion for order to
show cause why the bankruptcy court should not
dismiss the case. Between April and June, 1991,
Debtor filed a number of revised disclosure state-
ments and proposed plans for reorganization in
which it indicated its intent to file an adversary pro-
ceeding against the City based on two assertions:

15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.)))**

(1) the City violated the automatic stay by its resolutions of June 25, 1990; and (2) the City allocated the assessments incorrectly because it based its allocation on the relative sizes of the parcels instead of on the relative beneficial use of the parcels. Debtor contends that if it wins this lawsuit it will have equity in its property, enabling it to pay its creditors.

On July 8, 1991, the bankruptcy court heard the motion to dismiss. On July 22, 1991, the bankruptcy court entered findings of fact and conclusions of law dismissing Debtor's Chapter 11 case and refusing to approve Debtor's plan of reorganization, because it found that Debtor was "unable to present a confirmable Chapter 11 plan, and that further delay is unreasonable and prejudicial to creditors." As to the improper allocation, the bankruptcy court found that the validity of the original allocation was a question of state law, more appropriate for state court. The district court affirmed the dismissal of the case on automatic stay grounds and thus did not decide if other reasons existed for the bankruptcy court to refuse to approve Debtor's disclosure statement and to dismiss the case.

**\*2** We AFFIRM the dismissal of Debtor's case on the grounds found by the bankruptcy court and thus find it unnecessary to reach any automatic stay issues.

Under § 1112(b) of the Bankruptcy Code, the court may dismiss a case for cause, which includes, in part, (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; and (3) unreasonable delay by the debtor that is prejudicial to creditors. 11 U.S.C. § 1112(b)(1)-(3) (1988). The bankruptcy court has wide discretion to determine whether cause exists under § 1112(b), and under its equitable powers, it may consider factors other than those listed in § 1112(b). *In re Reichert,* 138 B.R. 522 (Bankr.W.D.Mich.1992).

Courts have used § 1112(b) to dismiss cases when debtors have no ongoing business operations

and no structure of assets. *See, e.g., In re Anderson,* 52 B.R. 159, 163 (Bankr.D.N.D.1985) (dismissal warranted under § 1112(b)(2) when debtor after two years of bankruptcy was still unable to confirm a plan); *In re Ellison Assocs.,* 63 B.R. 756, 766 (Bankr.S.D.N.Y.1983) ( "Inasmuch as debtor had no assets, it is unlikely to form an effective plan of rehabilitation[,]" which warrants dismissal under § 1112(b)(1) and (2).); *In re Eden Assocs.,* 13 B.R. 578, 584 (Bankr.S.D.N.Y.1981) (debtor's "only alleged asset is this property, [and debtor] has no other real creditors and no employees; who has, in short, no ongoing business to reorganize").

Courts have also discussed these factors when converting Chapter 11 cases to Chapter 7 cases under § 1112(b). For example, in *In re Macon Prestressed Concrete Co.,* 61 B.R. 432, 436 (Bankr.M.D.Ga.1986), the court, in converting the case to Chapter 7, stated that

[i]f it is apparent that the debtor has no profitable core around which to structure a plan of reorganization, if the debtor is faced with continuing loses, and if the debtor's assets are declining in value, the best interests of the creditors may require the court to order liquidation ... In sum, the debtor should be given a fair opportunity to reorganize, but the debtor should not be permitted to continue in a futile effort to reorganize.

In *In re Stolrow's Inc.,* 84 B.R. 167 (Bankr. 9th Cir.1988), the BAP referred to factors used to determine if debtors have filed cases in good faith and to consider in motions to dismiss for cause. These factors include whether: (1) the debtor has only one asset; (2) the secured creditors' lien encumbers that asset; (3) there are generally no employees except for the principles; (4) there is little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments; (5) there are few, if any, unsecured creditors whose claims are relatively small; (6) there are allegation of wrongdoing by the debtor or its principles; (7) the debtor is afflicted with "the new debtor syndrome: in which a one-asset equity has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.
12

15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.)))**

been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors; (8) bankruptcy offers the only possibility of forestalling loss of the property. *Id.* at 171 (citing *In re Hulse,* 66 B.R. 681, 682-83 (Bankr.M.D.Fla.1986)).

*\*3* In this case, the facts do not support a showing that Debtor filed Chapter 11 in bad faith; however, the facts do show that Debtor has lost control of its principal asset, did not oppose losing the smaller parcel of property, has no business to operate, and is unable to rehabilitate itself. Debtor filed for bankruptcy on May 10, 1989, and was unable to get a plan confirmed or a disclosure statement approved by the time the bankruptcy court dismissed its case on July 22, 1991. Furthermore, Debtor is a partnership that does not operate as a business and only has three non-insider unsecured creditors. Debtor's major assets, the two parcels of property, no longer belong to Debtor, since it lost the larger parcel to the Brias in June, 1990, and the smaller parcel to the City in September, 1990, after an unopposed lift stay motion by the City. Finally, more than two years after filing Chapter 11, Debtor proposed a final plan, which the bankruptcy court refused to approve when it dismissed Debtor's case, and based its reorganization on the threatened lawsuit against the City. Debtor is not time barred from challenging the October 1986 assessment; thus, to prevail in its threatened lawsuit against the City, Debtor must show that the allocation of the assessment occurred in June 25, 1990, when the City revised the assessment after the Bria's foreclosure action, and that the City improperly and illegally allocated the assessment on an equal and pro rata basis.

These factors show that Debtor will be unable to effectuate a plan, that its estate has diminished and left Debtor without a reasonable lilitation, and that further delay will prejudice creditors. We, therefore, AFFIRM the bankruptcy court's dismissal of Debtor's case under § 1112(b).

AFFIRMED.

C.A.9 (Nev.),1994.
In re Sparks Dirt Project
15 F.3d 1089, 1994 WL 19012 (C.A.9 (Nev.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit "B"

Exhibit "B"

Westlaw.

188 F.3d 513, 1999 WL 639188 (C.A.9), 3 Cal. Bankr. Ct. Rep. 51
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 188 F.3d 513, 1999 WL 639188 (C.A.9))**

**C**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA9 Rule 36-3 for
rules regarding the citation of unpublished opin-
ions.)

United States Court of Appeals, Ninth Circuit.
In re: J AND D EQUIPMENT RENTALS, INC., a
Nevada Corporation, d/b/a Custom Trailers; Cul-
verwell Second Family Limited Partnership, Debt-
ors.

J AND D EQUIPMENT RENTALS, INC.; Culver-
well Second Family Limited Partnership; James
Culverwell, Appellants,

v.

Atilio CAPURRO; Mariellen Capurro, Appellees.

No. 98-17413.
BAP No. NV-97-0162-RRyMe.
Submitted June 15, 1999 San Francisco, California
FN**

> FN** The panel unanimously finds this
> case suitable for decision without oral ar-
> gument. Fed. R.App. P. 34(a)(2).

Decided Aug. 19, 1999.

Appeal from the United States Bankruptcy Appel-
late Panel of the Ninth Circuit Russell, Ryan, and
Meyers, Judges, Presiding.

Before SCHROEDER, B. FLETCHER, and
BOOCHEVER, Circuit Judges.

MEMORANDUM FN*

> FN* This disposition is not appropriate for
> publication and may not be cited to or by
> the courts of this circuit except as may be

provided by 9th Cir. R. 36-3.

*1 The debtors appeal from the opinion of the
Bankruptcy Appellate Panel ("BAP") affirming the
bankruptcy court. Because the parties are familiar
with the facts, we shall not repeat them.

I. *Judicial estoppel*

The debtors argue that the incompatible state-
ments made by James G. Culverwell ("Culverwell")
were honest mistakes. The bankruptcy court dis-
agreed, finding that Culverwell's prior conduct was
"an attempt to manipulate the bankruptcy system
and not only the bankruptcy system, but other judi-
cial process." [ER p. 234] That factual finding is
not clearly erroneous. *See In re Lawson,* 122 F.3d
1237, 1240 (9th Cir.1997) (whether a debtor acted
with intent to hinder or defraud creditors is a find-
ing reviewed for clear error). There were facts from
which the bankruptcy court could conclude that
Culverwell asserted different ownerships for the
equipment and vehicles in an attempt to keep the
Capurros from executing their judgment against J
and D Equipment Rentals, Inc. ("J and D").

The debtors also argue that judicial estoppel
should not have been applied because no court re-
lied on any of the alleged inconsistent positions.
Yet Culverwell added Culverwell Second Family
Limited Partnership ("CSFLP") as a counter-
claimant in the Nevada state court action by intro-
ducing evidence that the equipment and vehicles
belonged to CSFLP. Introducing evidence in a court
proceeding in support of the introduction of an ad-
ditional party is sufficient for the application of es-
toppel. "[A] party may not gain an advantage by
taking one position, and then seeking a second ad-
vantage by taking an incompatible position." *Cigna
Property and Casualty Ins. Co. v. Polaris Pictures
Ass'n,* 159 F.3d 412, 419 (9th Cir.1998), petition
for cert. filed (U.S. May 21, 1999) (No. 98-1883).
Moreover, it makes no difference that the inconsist-
encies occurred in past litigation, i.e., the Nevada
state court and Idaho bankruptcy proceedings.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

188 F.3d 513, 1999 WL 639188 (C.A.9), 3 Cal. Bankr. Ct. Rep. 51
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 188 F.3d 513, 1999 WL 639188 (C.A.9))**

Judicial estoppel is sometimes said to apply to preclude parties from taking inconsistent positions in the same litigation, but our cases as well as those from other circuits have applied the doctrine in disregard of this supposed limitation. We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation.

*Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 605 (9th Cir.1996) (citations and quotations omitted).

It was not an abuse of discretion for the court to use its equitable powers to invoke judicial estoppel in this case.

## II. *Evidentiary hearings*

The debtors complain that the bankruptcy court should have held evidentiary hearings regarding both the motion for relief from the automatic stay and the motion to reinstate CSFLP's Chapter 11 case. But the debtors did not identify material facts in dispute, nor did they identify facts not before the bankruptcy court that would influence its decision. *See In re The Two "S" Corp.,* 875 F.2d 240, 242 (9th Cir.1989) (no purpose served by evidentiary hearing if all facts are before bankruptcy court and not disputed). There was no abuse of discretion in refusing to hold evidentiary hearings.

## III. *Motion for relief from automatic stay and motion to reinstate*

### A. *Relief from the automatic stay*

**\*2** This court reviews for an abuse of discretion the decision to lift the automatic stay. *See In re National Environmental Waste Corp.,* 129 F.3d 1052, 1054 (9th Cir.1997), *cert. denied,* 118 S.Ct. 2368 (1998). The bankruptcy court has wide latitude to grant relief from the stay, for example, where "the debtor engaged in unreasonable or inequitable conduct, or prejudice would result to the creditor." *Id.* at 1055.

The Capurros filed a motion for relief from the

automatic stay because, given the contradictory stories advanced by Culverwell regarding the ownership of the vehicles and equipment, a lifting of the stay was necessary to allow the Capurros to execute the Nevada state court judgment. Because the bankruptcy court did not clearly err in finding that Culverwell had manipulated the system, the grant of relief from the automatic stay was not an abuse of discretion.

### B. *Denial of motion to reinstate*

The bankruptcy court has discretion to dismiss a case for cause under 11 U.S.C. § 1112(b) "in the best interest of creditors and the estate." *See In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994) (bankruptcy court's decision to dismiss reviewed for abuse of discretion).

The debtors argue that the bankruptcy court dismissed CSFLP's case based on its lack of assets. They then reason that because the court applied judicial estoppel and held Culverwell to his representations that the equipment and the vehicles were CSFLP's property, the court should have reinstated CSFLP's Chapter 11 case, because CSFLP was not without assets after all.

First, the court dismissed CSFLP's Chapter 11 case based on the trustee's motion, which was in turn based on CSFLP's failure to file schedules, attend meetings, or pay trustee's fees. The court explicitly did not rule on CSFLP's own motion to dismiss, which alleged that it had no assets. The court therefore did not dismiss the case because CSFLP had no assets.

Second, when the court refused to reinstate the Chapter 11 case, it did so because CSFLP was not a business, had no income, had no possibility for reorganization, and a Chapter 11 proceeding would contravene the purposes of the Bankruptcy Code. *See* 11 U.S.C. § 1112(b)(2) (court may dismiss case for inability to effectuate a plan). The court also noted Culverwell's manipulation of the system. The court therefore did not err in refusing to reinstate the case, as it did not rely on the assumption that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

188 F.3d 513, 1999 WL 639188 (C.A.9), 3 Cal. Bankr. Ct. Rep. 51
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 188 F.3d 513, 1999 WL 639188 (C.A.9))**

CSFLP had no assets.

AFFIRMED.

C.A.9,1999.
In re J and D Equipment Rentals, Inc.
188 F.3d 513, 1999 WL 639188 (C.A.9), 3 Cal.
Bankr. Ct. Rep. 51

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit "C"

# Exhibit "C"

Westlaw.

Page 1

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Montana.
In re John Patrick STOKES, Debtor.

No. 09–60265–11.
Sept. 21, 2009.

John Patrick Stokes, pro se.

James H. Cossitt, James H Cossitt, PC, Kalispell,
MT, for Trustee.

Daniel P. McKay, Neal G. Jensen, United States
Trustee's Office Great Falls, MT, for U.S. Trustee.

### *MEMORANDUM OF DECISION*

RALPH B. KIRSCHER, U.S. Bankruptcy Judge.

*1 At Butte in said District this 21st day of
September, 2009.

The following contested matters are pending in
this Chapter 11 bankruptcy case: (1) the Debtor
John Patrick Stokes' ("Stokes" or "Debtor") motion
to lift stay (Docket No. 58) seeking to proceed with
his appeal of judgment in the Montana Supreme
Court Case No. DA 09–0049, but to continue the
stay of execution of judgment; and (2) the Office of
United States Trustee's ("UST") motion to convert
this case to Chapter 7 filed on April 22, 2009
(Docket No. 24). Stokes filed objections and a mo-
tion to dismiss the UST's motion for lack of juris-
diction, and Stokes appeared pro se and testified at
the hearing in opposition to the UST's motion
which was held after due notice at Missoula on Au-
gust 13 and 14, 2009. Debtor's motion to lift stay
was heard on July 16, 2009, and held in abeyance
pending the decision on the UST's motion. Other
witnesses testified and exhibits were admitted at the
hearing on August 13 and 14, 2009, as described in
detail below. At the conclusion of the parties' cases-
in-chief the Court took the UST's motion to convert

under advisement. After review of the record and
applicable law, this matter is ready for decision. For
the reasons set forth below the Court will enter a
separate Order overruling the Debtor's objections
and granting the UST's motion, and converting this
case to Chapter 7 of the United States Bankruptcy
Code. Debtor's motion to lift the stay will be denied
without prejudice.

The UST was represented at the hearing on Au-
gust 13 and 14, 2009, by attorney Neal G. Jensen
("Jensen") of Great Falls, and UST bankruptcy ana-
lyst/certified public accountant ("CPA") Larry
Rezentes ("Rezentes") testified. Attorneys Joel E.
Guthals of Billings, Robert K. Baldwin and Trent
M. Gardner of Bozeman appeared representing
creditors Todd Gardner and Davar Gardner
(together "Gardners"), who filed a joinder to the
UST's motion to convert, and Todd Gardner testi-
fied. In addition Gardners called the City Attorney
of Kalispell, Montana, Charles Harball ("Harball")
to testify.

The Montana Department of Revenue ("DOR")
filed a joinder to the UST's motion to convert
(Docket No. 38) and was represented by assistant
attorney Keith A. Jones, and DOR's bankruptcy
specialist Kim Davis ("Davis") testified. The
United States of America, Internal Revenue Service
("IRS") filed a joinder (Docket No. 42) to the
UST's motion, but did not appear. Creditors
Thomas H. Boone, trustee of Boone Karlberg Em-
ployees Profit Sharing Trust, William E. Mytty,
Sandra F. Mytty, Quality Supply, Inc. Profit Shar-
ing Plan and Trust, Douglas S. Hadnot, J. Chriss
Crawford, Myrna K. Crawford and Stephen S. Ellis,
M.D., P.C. Employees Amended and Restated Pen-
sion Plan (together "Boone, et al.") filed a joinder
to the UST's motion (Docket No. 33) and were rep-
resented by attorney Robert J. Sullivan of Missoula.
Exhibits ("Ex.") 9, 17, 18, 19, 21, 22, 23, 24, 25
and 26 offered by the UST, and Gardners' Ex. 2, 3,
and 11, were admitted into evidence at the hearing.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

**\*2** Although the Debtor argues that this Court lacks jurisdiction to convert this case to Chapter 7, under 28 U.S.C. § 1334(a) this Court has original and exclusive jurisdiction in this bankruptcy case, and the Bankruptcy Code authorizes conversion of a Chapter 11 case to a case under Chapter 7 under 11 U.S.C. § 1112(b) if cause is shown and if conversion is in the best interests of creditors, and if the debtor fails to establish that there is a reasonable likelihood that a plan will be confirmed within applicable timeframes and that the acts or omissions of the debtor were not reasonably justified and will be cured within a reasonable period of time. The UST's motion to convert the case to Chapter 7 is a core proceeding under 28 U.S.C. § 157(b)(2). Debtor's motion to lift the stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

## FACTS

John Stokes moved to Montana in 1994 and became a resident, but he testified at his § 341(a) meeting of creditors that he had never filed an income tax return for the State of Montana and that he has not filed a federal income tax return since 1985. Ex. 2, Transcript ("Tr."), pp. 82, 83. At the hearing on August 13, 2009, Stokes testified that he calls the IRS "every year" and "they say I don't owe any taxes."

Stokes lives in a house on 80 acres at 12887 Raven Way in Bigfork, Montana. In 1994 he mortgaged the property to HSBC. 341 Tr., p. 28. Stokes owned that property until he transferred the house and 80 acres in 1998 to his daughter Elizabeth Stokes–Pickavance ("Elizabeth"), who paid him no money for the property. Stokes kept a life estate and pays his daughter no rent, but pays the mortgage and expenses. Ex. 2, pp. 27, 28, 167, 169.

In April 2000 Stokes signed a promissory note in the amount of $665,000. Stokes testified that note was assigned to creditors Boone, et al. Stokes admitted that he failed to make payments on that note. Foreclosure proceedings were commenced,

and Stokes counterclaimed alleging usury. A settlement was reached between Stokes and Boone, et al. on April 24, 2006. Stokes testified that under that settlement he released his usury claims, and a balloon payment was due on April 24, 2009. That balloon payment was not made and interest continues to accrue on that debt at the rate of $9,000 per month. Stokes testified that the balloon payment has grown to $1.1 million but that he has assets to pay it.

Stokes owns and operates KGEZ, an AM radio station in Kalispell, Montana, under license from the United States of America, Federal Communications Commission ("FCC"). He testified that KGEZ is the oldest continuously operating AM station in America. The station sits on 6.5 acres at 2995 Highway 93 South, and Stokes owns additional real property nearby on which are located KGEZ's radio towers. Stokes testified that a corporation owned by him purchased KGEZ and its property in April 2000, but that his secretary failed to keep the corporation registered with the State of Montana and it was dissolved [FN1], leaving Stokes as the sole successor and owner.

> FN1. After the dissolution, he testified, his corporation's name was registered by the Montana Human Rights Network.

**\*3** Stokes had his corporation which owned KGEZ sign a promissory note in the amount of $985,000, and gave Stokes a second mortgage. In 2002 Stokes assigned that mortgage to his daughter Elizabeth. Nothing was ever recorded regarding that assignment, and the public record still shows the property is in Stokes' name. In Ex. 9, Stokes' responses to Gardner's discovery requests dated February 25, 2008, Stokes identified his assets in response to Interrogatory No. 14 on page 10 as a "2nd Mortgage—160 acre easement" which he acquired on January 2001, the value of which and Stokes' equity of which are stated as $2,800,000. Stokes testified that he answered those interrogatories in a hurry and was sanctioned for his responses. He testified that he owed the second mortgage to his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

daughter, and that he transferred the easement to her six years earlier.

Stokes testified that KGEZ grosses about $7,000 or $8,000 per month, and that it just about breaks even after the bills are paid. He testified that he does not need much. However, Stokes answered "No" at his § 341 meeting when asked whether the radio station ever made money. Ex. 2, 341 Tr., p. 183. At the hearing Stokes was impeached when he answered "No" when asked if it was true that the radio station has never made money. When asked whether he lived off of donations from his audience Stokes answered "No" at the hearing, but at a hearing held on October 12, 2007, in Cause No. DV–01–023(c) in the Montana Eleventh Judicial District Court, Flathead County, Stokes testified that he, his wife and his daughter work for free and live on donations from his audience. Ex. 11, p. 13.

KGEZ's towers are located on 47 acres of land near the Kalispell City Airport. Harball is the Kalispell City Attorney. He testified that the FAA has found that the KGEZ radio towers are a hazard to aviation, that the towers extend 150 feet into the necessary airspace [FN2] of the airport, and that the FAA has specifically advised Kalispell how to proceed to remove the hazard to aviation.

> FN2. Stokes and Harball argued about whether the KGEZ towers were put up illegally 50 years ago, which is irrelevant to the pending matter.

Stokes testified that the City of Kalispell voted to condemn his radio station property. The Kalispell City Council met and passed a resolution with the mayor dated December 15, 2008, Ex. 3, acknowledging the hazard to aviation posed by the KGEZ towers and the need to remove and/or relocate the towers. Ex. 3. Ex. 3 resolves at page 2, Section 1, to direct the city manager to advise the city counsel of the projected costs of relocating the KGEZ towers, after which the City Council will decide whether or not to make a formal offer to the owner of the KGEZ towers. Section II of Ex. 3

provides that if a formal offer is made and rejected, the City Council will determine whether or not it will commence condemnation action against the towers. Harball testified that the City has not yet decided to expand its airport, has not decided to make an offer to Stokes for the towers, and has not yet begun condemnation proceedings against the KGEZ towers, but that if the City wants to use FAA funds to expand its airport it must mitigate the towers.

*4 Harball explained that it not necessary for Kalispell to acquire or condemn the KGEZ land under the towers, but rather it needs only lower the KGEZ towers below the necessary airspace or relocate them [FN3] to eliminate the hazard to aviation. Harball testified that Kalispell does not have $1 million available for Stokes' property. Under cross examination by Stokes, Harball acknowledged that the City has purchased two parcels of property near the airport, and that if the City decides to acquire the KGEZ towers it will make Stokes an offer.

> FN3. Harball explained that the radio towers need only be within sight of the radio station to operate.

The Gardners sued Stokes' corporation in state court and obtained a default judgment against the dissolved corporation in the amount of $180,000. Stokes testified that several months later Gardners won a slander judgment in the amount of $3.9 million, but that he was not allowed to examine witnesses. The trial of Gardners' action against Stokes' corporation was held in September of 2008. Stokes admitted that the trial was by jury and he was represented by counsel, who put on witnesses, offered exhibits and cross examined Gardners' witnesses, and made a closing argument. After the jury deliberated [FN4] it entered judgment against Stokes in favor of Gardners including a compensatory award in the sum of $1.8 million and, after a proceeding involving a request for punitive damages, the jury awarded Gardners another $2 million.

> FN4. Stokes testified that alleged jury tam-

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

pering occurred.

Stokes went to see attorney Gregory W. Duncan ("Duncan") about filing a bankruptcy petition. Stokes testified that his secretary filled out a worksheet of his liabilities, Ex. 21. Ex. 21 includes claims for back taxes owed by the corporation Z–600 Inc. to the IRS in the estimated amount of $18,117.04, and a claim owed to the Montana Dept. of Labor & Industry by Z–600 Inc. in the amount of $3,356.36.

**Stokes' Chapter 11 Filing.**

Stokes filed his voluntary Chapter 11 petition on March 4, 2009, and filed an amended petition signed by Stokes on the same date. He testified that the only reason he filed a bankruptcy petition is because of the Gardners' $4 million judgment against him. Stokes listed his address on the petition as 12887 Raven Way in Bigfork. He listed two dba's, Skyline Broadcasters, Inc., and Z–600, Inc. Rezentes testified that Stokes' stated reasons for filing his petition were a $3.8 million judgment against him, and a condemnation case. Stokes testified that the only reason he is in bankruptcy is to overturn the $3.8 million dollar judgment against him by appeal.

Originally Stokes was represented in this case by Duncan, who prepared the Debtor's original petition, Schedules and Statement of Financial Affairs ("SOFA"), and prepared Debtor's amended Schedules and SOFA. Duncan filed a motion to withdraw as Debtor's counsel on June 5, 2009, which was granted after a hearing held on June 18, 2009, and thereafter the Debtor has appeared pro se.

On July 13, 2009, Stokes filed complaints against Gardners, Questa and Boone, et al., and attorney Wade DaHood ("DaHood") and DaHood's law firm that represented him in the condemnation case. Stokes' complaint against Gardners in Cause No. DV–09–896A, Ex. 17, alleges claims based on RICO and alleges that Gardners obtained their judgment by perjury, and for damages to his KGEZ towers. Ex. 17 does not total Stokes' damage re-

quests, but the thirteen counts request damages against Gardners in amounts of several tens of millions of dollars, and in addition count one prays to void Gardners' $3.8 million judgment against Stokes, which Stokes testified is the same judgment he has appealed to the Montana Supreme Court which is pending. Todd Gardner testified that Gardners have prior judgments against Stokes, which he did not pay except for minor amounts from Stokes' accounts against which Gardners levied in execution.

*5 Stokes' complaint against DaHood in Cause No. DV–09–897C states claims for relief based on embezzlement and extortion. Ex. 18. Stokes filed a complaint against Questa and Boone, et al., in Cause No. DV–09–898B on July 13, 2009, alleging usury and settlement made in bad faith, seeking $2.7 million in damages and other relief. Ex. 19.

**Debtor's Original Schedules.**

The Schedules and SOFA were not filed with the petition, and the Clerk sent Debtor a deficiency notice on March 5, 2009, alerting the Debtor of the deficiencies. Debtor asked for and received an extension to file his Schedules and SOFA, and filed his initial Schedules and SOFA on April 3, 2009. Ex. 24. Stokes testified that his attorney prepared his original Schedules and SOFA in a rush, and that as a result they were "horrible" and "wrong." Under cross examination Stokes testified that he never reviewed his original Schedules, and that he received the last page of the Schedules and SOFA by facsimile and was asked to sign the last page without reviewing them, which he did.

Ex. 24 includes the original Schedules and SOFA. Schedule A lists real property consisting of the Debtor's residence at 12887 Raven Way in Bigfork, valued at $1.3 million, and 6 acres of real property at 2995 Highway 93 South in Kalispell where KGEZ is located, valued at $1.8 million. Stokes did not list his daughter Elizabeth's interest in his residence on his original Schedules, or list her as a codebtor.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

Schedule B lists $148,042.16 in personal property. Schedule B does not include any interest in the FCC broadcast license for KGEZ, and neither does Schedule B include the broadcast towers for KGEZ. Also not included on Schedule B was the $2,800,000 asset he disclosed on page 10 of Ex. 9, described as a second mortgage on a 160 acre easement. Stokes testified that his Schedule B failed to list a sixty inch television which he included in his amendments.

At item 8 of Schedule B, "Firearms and sports, photographic, and other hobby equipment", Stokes listed a 12 gauge shotgun valued at $100 and fishing gear valued at $300. This entry was amended substantially. Stokes testified that the original values were a typographical error. Item 19 of Schedule B, "Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A—Real Property" is marked "None", which Stokes later amended.

Item 21 of Schedule B ("Other contingent and unliquidated claims of every nature ...") is marked "None." Stokes testified that his entry at Item 21 was an omission on his part, including his omissions of claims totaling approximately $10 million. Five suits involving Stokes are listed below in the SOFA at paragraph number 4. Stokes testified that he does not know the reason the claims were omitted from Item 21.

At Item 23 ("Licenses") of Schedule B Stokes listed "None", which he later amended on Ex. 25 to add an "FCC License for Radion [sic] KGEZ" as jointly owned with a value of $1,500,000. On Ex. 9, p. 11, in response to Gardners' Interrogatory No. 15 Stokes responded "This License belongs to the FCC." Stokes testified that his discovery response is a factual statement and that his inclusion of the license on Schedule B at a value of $1.5 million "must have been an oversight."

*6 Item 25 of Schedule B ("Automobiles, trucks, ...") lists a single 2002 Dodge 1500 pickup

valued at $2,075. Schedule B at item 26 ("Boats, motors, and accessories") is marked "None." Rezentes testified that the Debtor owns a watercraft which was missing from the Schedules. Ex. 24. Item 28 ("Office equipment, furnishings and supplies") of Schedule B lists $66,000 with the explanation "See Attached List." The attached list at the end of Ex. 24 is a statement titled "Income by Customer Summary" which Stokes testified was included by mistake, and that there was no attached list for Item 28. Item 29 ("Machinery, fixtures, equipment, and supplies used in business") is marked "None." The total value of personal property listed on Schedule B is $148,042.16.

Schedule D of Ex. 24 lists three creditors holding secured claims, including a $248,585.26 claim secured by a mortgage on a home loan from HSBC Mortgage Services, and a $1.3 million secured loan of Questa Resources secured by KGEZ and "residence property," UCC and mortgages, with a balloon payment due in May 2009. Stokes listed the value of Questa's collateral on Schedule D as $1.8 million. Stokes testified that he has not paid Questa because he is tied up in this case, and he admits that interest continues to accrue on Questa's claim at the rate of $9,000 per month at twelve percent. Ex. 2, Tr., pp. 106–07. Stokes did not list the assignment to his daughter of the mortgage on KGEZ on Schedule D. He testified that he forgot about the assignment until after his § 341 meeting.

Stokes checked the box on Schedule E stating he has no creditors holding unsecured priority claims. Stokes testified that was not true, and that he assumes that he owes taxes. Ex. 2, p. 81. Stokes thought that priority creditors are those with superior loans.

Schedule F of Debtor's original Schedules list unsecured nonpriority claims in the total amount of $57,425.17, and failed to list the $3.8 million judgment which had been entered against Stokes in favor of Gardner, which he described as the only reason he filed for bankruptcy. Ex. 24. Stokes testified that the Gardners' judgment was admitted.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

The SOFA, at item 4 ("Suits and administrative proceedings, executions, garnishments and attachments") listed five civil lawsuits in the Montana Eleventh Judicial District Court for Flathead County, including an action by Gardners against Stokes in Case No. DV–07–729; a foreclosure action by William E. Mytty et al. against Stokes; an action by the "MDDT" against Stokes; and an action by "Poeshel" against Stokes.

Schedules I and J and SOFA list Debtor's income as a $6,000 monthly draw. Ex. 24. Rezentes testified that the Schedules and SOFA show that the Debtor just about breaks even from his business, and has no ability to pay his debt obligations.

The original Schedules and SOFA were signed by Stokes under penalty of perjury. At the hearing Stokes testified that he freely admits that his original Schedules were wrong. Ex. 24 includes Stokes' declarations, under penalty of perjury, that he had read the Schedules and SOFA and that they are true and correct to the best of his knowledge, information, and belief. Stokes testified that signing them was a "very bad mistake" on his part. Later Stokes testified: "I never reviewed the original Schedules" and that "I was asked to sign the last page".

### Section 341(a) Meeting of Creditors.

*7 The § 341(a) meeting of creditors was scheduled for April 10, 2009. The UST sent the Debtor a letter outlining his obligations under Chapter 11, and that nonfulfillment of the obligations may result in the UST filing a motion to convert to Chapter 7. Stokes appeared at the § 341 meeting and was examined by the UST and others.

At page 9 of the Transcript of the § 341 meeting, Ex. 2, Stokes was asked if he had an opportunity to review his Schedules and SOFA carefully to ensure they were accurate, and he answered "Yes." He was asked if at the time he signed his Schedules under penalty of perjury if he understood them to be true and accurate, and he again answered "Yes."

Stokes answered "Right" when asked if KGEZ

"was running at a wash." He testified that his statement that he took a $6,000 monthly draw is not accurate and his average net monthly income is closer to $0. Ex. 2, p. 103.

Stokes testified at the § 341 meeting that he put no value on his life estate in 12887 Raven Way. Tr., p. 170. He testified that he did not mention at the § 341 meeting the $2.5 million which he claims he owes to his daughter. At page 97 of Ex. 2, Line 14, when asked if there were any other creditor that he owes money to for any reason, Stokes answered "No" and that he went through his schedules "very well together." After the § 341 meeting, Stokes testified that he remembered that his daughter had a claim against him.

Stokes testified at the 341 meeting that he owes 5 years or so of federal employees' taxes for payroll liability, and owes $3,000 to the Montana Department of Labor and Industry for unemployment insurance contributions from 2001 through 2004. Ex. 2, pp. 88, 89. He testified that he has never filed tax returns for the State of Montana. He was asked at the § 341 meeting about his 2008 tax returns and he answered that Jensen told him to redo all his tax returns as individual since his corporation was dissolved. Stokes testified that he owes 2 years worth of property taxes on his house, approximately $7,000, and that he owes $21,000 in property taxes on the radio station. Ex. 2, pp. 94–96.

Rezentes testified that he attended the 341 meeting and discussed with the Debtor the administrative and compliance requirements for a chapter 11 case, the facts of the case and the Debtor's plan for reorganization, and that the Debtor stated he received the UST's letter. Stokes admitted that he was asked at the § 341 meeting whether he was aware of the requirements to pay quarterly fees and file monthly operating reports.

Stokes testified that he was asked at the § 341 meeting whether he went through the Schedules and whether they were true and accurate, and he answered yes. Stokes admitted that there were a lot

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

of typographical errors and that at least one asset was not included in his Schedules. Stokes agreed at the § 341 meeting to amend his Schedules to correct errors within ten days, but he testified at the hearing that he did not correct within 10 days. At the § 341 meeting Jensen asked Stokes whether he understood that he had "one more shot to make your schedules and statements absolutely accurate, every line," and Stokes answered that he understood. Ex. 2, p. 67. Jensen advised Stokes that he would again have to sign the declaration under penalty of perjury that everything on the amended schedules is true and correct, and Stokes answered "Yes" that he understood. Ex. 2, p. 67.

*8 Rezentes testified that he understood from the § 341 meeting that the Debtor was going to establish a debtor-in-possession ("DIP") account at Wells Fargo. He testified that he reviewed with Stokes in detail the format for monthly operating reports required by the UST, and that he told Stokes that the monthly reports were due by the fifteenth day of the following month.

Rezentes explained that the purpose of the monthly operating reports for Chapter 11 debtors is to allow the UST to assess whether a debtor's operations are self sustaining, to see if debt is being incurred without court authorization, to see if a proper DIP bank account is established and to verify that insurance is maintained on property. Rezentes testified that he later told both the Debtor and his attorney Duncan over the phone that the first monthly operating report was due by April 15, 2009, for March 2009, but that the UST extended the due date to April 30. When asked whether the Debtor filed his monthly operating reports for March, April, May or June on time Rezentes answered "No." Rezentes testified that the bank statements for the months of March through June of 2009 have not been submitted by the Debtor, and that he is missing a number of forms which would allow the UST to monitor Debtor's case.

Stokes asked Rezentes about the profit and loss ("P & L") statements which the Debtor did deliver

to the UST. Rezentes answered that the P & L statements which Debtor delivered were on his radio station, that some statements on the P & Ls are made on a cash basis and others are made on an accrual basis. Rezentes testified that the Debtor was made aware of the requirement for paying UST quarterly fees, and that failure to pay the fees could result in dismissal or conversion of the case to Chapter 7. Ex. 2, pp. 5–6.

Kim Davis of the DOR testified that the DOR's only contact with Stokes was at the § 341 meeting, and that he never provided the DOR with his Quickbooks data like he said he would. She testified that, based on Stokes' § 341 testimony, there are taxes and penalties owing to the DOR.

**Debtor's Amended Schedules/Ex. 25.**

Stokes filed amended Schedules and SOFA, Ex. 25, on July 24, 2009, although the date of Stokes' signatures on Ex. 25 is May 29, 2009. Stokes testified that the amended Schedules sat on his desk and that "I did the best I could" in preparing the amended Schedules. The amended Schedules continue to reflect serious errors and omissions.

Also on July 24, 2009, Stokes filed additional documents including P & L statements, and filed a combined disclosure statement and plan (Docket No. 73). Rezentes testified that those documents did not comply with the UST's monthly operating report format. He testified that UST Form 11 specifies the required information which the debtor must provide under penalty of perjury, but that the Debtor failed to file UST Form 11 or Form 18, and failed to provide copies of bank statements to the UST so they could verify the Debtor's representations with respect to money coming in and going out. Rezentes testified that, from the documents filed by the Debtor, the UST did not know whether Stokes set up a DIP account, whether any such account is in a safe and insured institution, whether the property was insured and whether the Debtor's statements are made under oath.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

\*9 Debtor's amended Schedule A lists a total of $10,700,000 in interests in real property, versus $3,100,000 on the original. Ex. 25. The amended Schedule A omits Debtor's interest in his Raven Way residence in Bigfork, which was listed on the original Schedule A at a value of $1,300,000, but his life estate in Raven Way was added to Schedule B at Item 19 with a value listed as both "Value Unknown" and $0.00.

Schedule B, item 4, was amended to add a 60 inch TV. Item 8 was amended to include more than $60,000 worth of additional firearms, fishing gear, guitars, and an observatory. When asked under direct examination why these items were not on the original Schedule B Stokes responded that they were omitted.

Stokes testified that Rezentes told him to list his lawsuits in his amended Schedules. Item 21 of amended Schedule B, where "None" was marked originally, lists seven claims or lawsuits, including a claim against Donna "Poeschel" and Peter "Porschel" listed with a value of $1,200,000, Case No. DV–07–246; a claim against the Montana Department of Transportation ("MDOT") valued at $0, Case No. DA 07–0281; a claim against Gardners and others for fraudulently obtaining a default judgment, valued at $12,000,000; potential claims against Farmers Union Insurance, against HSBC for usury [FN5]; against the City of Kalispell based on its condemnation of Stokes' property to expand the airport [FN6]; against Stokes' attorneys Dahood and Ben Everett for embezzlement and other claims estimated at $410,000; and against "Judge Steward Stadler" to void the default judgment and return 120 acres of easement [FN7].

> FN5. Stokes' usury lawsuit against HSBC is based on the fact that HSBC has a mortgage against his residence on Raven Way. He agreed that he is obligated to HSBC although he only has a life estate in Raven Way.

> FN6. The value of the claim against Kalis-

pell listed on amended Schedule B is $0.00. Stokes testified that he hopes to receive fair market value of the condemned property, and that he was not paid a related contract worth $40,000.

> FN7. Stokes testified that Judge Stadler rewrote a contract and cost Stokes $11 million, and deprived him of his constitutional right to a fair trial.

Stokes testified that he has no idea why his claim against the Poeschels and Gardners was omitted from his original Schedule B. Stokes' complaint against Gardners in Cause No. DV–09–896A was admitted as Ex. 17. It was drafted by Stokes pro se and includes thirteen counts and a prayer for several tens of million dollars in damages, including a RICO claim. Stokes testified that the difference between the $12 million value on amended Schedule B for the suit against Gardners and the larger amounts requested in Ex. 17 is because he did not review it closely enough.

Ex. 19 is Stokes' complaint filed against Questa and several of the Boone, et al. creditors in Cause No. DV–09–898B alleging usury and a settlement made in bad faith, and praying for a total of $2,700,000 in damages and other relief. Stokes filed Ex. 19 in state court on July 13, 2009, but testified that he has not yet served it. He testified that the claim against Questa on Ex. 19 is not listed on his amended Schedules, and explained that he discovered the claim after the § 341 meeting, that he was not sure that he would proceed with that lawsuit, and has not yet served it on the defendants.

Stokes testified that he plans to file a lawsuit against Judge Katherine Curtis of the Montana Thirteenth Judicial District Court based on a violation of his constitutional right to a fair trial. He testified that he would combine his lawsuit against Judge Curtis with his suit against Judge Stadler [FN8]. No claim against Judge Curtis is listed in Debtor's amended Schedules or SOFA, which Stokes testified was an omission.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

> FN8. Stokes' claim against Judge Stadler is based on Stadler's conduct involving the easement. Stokes admitted that the Montana Supreme Court affirmed Judge Stadler's decision.

**\*10** Item 24 of amended Schedule B lists several additional motor vehicles, trailers, an RV 3 snowmobiles, an ATV and two 3–wheelers. Stokes admitted that he omitted a number of vehicles from his original Schedules, and the vehicles listed at Item 24 now total $40,663. Item 26 of amended Schedule B lists a boat valued at $6,000, solely owned by Stokes, and additional motor vehicles where in his original Schedule B he marked "None."

Item 28 of amended Schedule B now totals $76,000.00, up from $66,000 in the original, with the difference comprised of $10,000 worth of desks and computer equipment. Item 28 continues to say "See Attached List" but there is no such list attached to the amended Schedules. Item 29 of amended Schedule B lists $9,000 for two transmitters and electronics, where in the original Schedule B Stokes listed "None." The total value of personal property listed on amended Schedule B, Ex. 25, was increased to $15,467,631.38 from the $148,042.16 which Stokes listed on Ex. 24, Schedule B.

Amended Schedule D lists several additional creditors with secured claims, including creditors with claims assigned from Questa. The largest added secured creditor listed in on Schedule D is Stokes' daughter Elizabeth, who Stokes testified has a fully secured claim stated in the amount of $2,314,750 secured by Stokes' radio station property and easement. Stokes testified that her daughter has a second mortgage, that she pledged her home as security and cosigned the loan from Questa in order for Stokes to purchase the radio station. He testified that he calculated her $2,314,750 claim amount based on the interest rate. He testified that his daughter's omission from his original Schedule D was an oversight.

HSBC's secured claim on amended Schedule D is still listed as 12886 Raven Way, although that residence was deleted from the amended Schedule A. The value of HSBC's security is listed on amended Schedule A as $2,314,750, compared with $1,300,000 on his original Schedule A and D. Stokes testified that the difference must have been a "typo."

Stokes amended Schedule E to add property taxes owed to Flathead County, and the IRS with an estimated amount due in the sum of $57,173.50 for back taxes owed from 2003 through 2009. Stokes did not add the DOR to amended Schedule E [FN9].

> FN9. The DOR filed Proof of Claim No. 7 on August 20, 2009, asserting a total claim for taxes in the amount of $147,546.63, which the attachment states is estimated for years 2000–2008 for Stokes' failure to file original returns.

Amended Schedule F lists the Gardners' judgment in the amount of $3,800,000. Ex. 25. To the extent Gardners' judgment is oversecured their claim is accruing interest at the rate of $1,000 per day, although Stokes testified that their judgment has not been affirmed on appeal and that he will prevail. Amended Schedule I increased Stokes' monthly income from operation of his business to $7,202.

Stokes signed his amended Schedules, Ex. 25, like the originals, under penalty of perjury. When asked about the omissions of assets from his amended Schedules, Stokes answered that he did not check them before signing. When asked if he fully reviewed his amended Schedules Stokes testified that he apparently did not review them closely enough, and that they were prepared by Duncan.

**\*11** On cross examination Stokes admitted that his Schedules, after amendment, fail to list an obligation he owes to the MDOT. Stokes testified that he will pay that debt with $146,000 which is in Da-Hood's possession, and is why he sued DaHood.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

**Other Filings.**

The UST filed its motion to convert to Chapter 7 on April 22, 2009. Rezentes testified that the Debtor's failure to list the $3.8 million Gardners' judgment against him in his original Schedules, and Debtor's failure to file monthly operating reports, were the main reasons the UST filed the motion to convert. Joinders to the UST's motion to convert were filed by Gardners (Docket No. 26), the DOR (Docket No. 35), the IRS (Docket No. 42), and Boone, et al.

Stokes filed objections, and filed a combined plan and disclosure statement on July 24, 2009. Ex. 26. Under cross examination Stokes admitted that he cannot find in his disclosure statement any description of events leading up to his Chapter 11 case, and that his disclosure statement does not provide any financial information of the Debtor or historical financial data for KGEZ, does not provide a liquidation analysis, does not describe what information or sources he used to prepare the disclosure statement, does not provide any information of the present or future management of the Debtor, and does not provide any estimate of administrative expenses for this case. Stokes testified that he obtained the form he used for the disclosure statement and plan from a bankruptcy court site.

Stokes testified that his plan depends on reversing the Gardners' $3.8 million judgment on appeal, plus getting enough from Kalispell and the FAA in his condemnation case to pay creditors in full, including Boone, et al. Later, Stokes testified that he has assets to pay the Gardners' judgment even if it is affirmed.

Debtor's plan provides at article IV that all creditors, both secured and unsecured, will be pay in full upon Kalispell condemning the assets of KGEZ. He testified that the only reason he is in Chapter 11 is to proceed with his appeal and overturn Gardners' $3.8 million judgment. Stokes believes that he can pay creditors by refinancing. He testified that he could probably sell his radio station now, and he has had offers and turned them all down. Stokes testified that his plan proposes to pay his creditors first, and that he can relocate his transmission towers under a relocation program of the FAA.

With respect to the Debtor's combined plan and disclosure statement, Rezentes testified that the plan is speculative on the outcome of Debtor's litigation and the FCC, that its allegations regarding Debtor's attorney are unsubstantiated and the UST cannot rely on it. He testified that the plan does not designate classes of claims or provide for treatment of any claims, that it does not commit any of the Debtor's earnings for a period to repay debts, that it has no plan term, that it does not provide for acceptance or rejection of executory contracts, that it does not settle or adjust claims or provide for the rights of secured claims or general unsecured creditors, and that it does not provide for the sale of assets. The only means of implementation of the plan is speculation that the Debtor will prevail on his appeal of the Gardner judgment, and proceeds from the condemnation case.

**\*12** Rezentes testified that the Debtor is not current in payment of quarterly UST fees. The second quarter fees were due after the end of July 2009 in the amount of $325, and Rezentes testified that the Debtor has not paid. Under cross examination by Stokes regarding the quarterly fees, when asked if the fees had been paid, Rezentes testified that his last information was that the Debtor has not made payments of the quarterly UST fees, to which the Debtor replied that the fees were en route.

The Debtor asked Rezentes whether it appears from his documentation that his bills are being paid, and Rezentes answered that because several forms required in the monthly operating reports have not been submitted, he does not have enough information to confirm that bills are being paid.

Rezentes admitted that he has never analyzed a radio or television station for bankruptcy purposes. When asked by the Debtor if he was familiar with FCC Rule 310d which purportedly forbids the

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

transfer of an FCC license, Rezentes answered no. Rezentes testified that he has not applied to the FCC for approval of conversion of the case to Chapter 7. Stokes testified that he knows FCC rules and that they forbid transfers of FCC licenses without prior written approval, and the UST has not obtained that approval.

Davis of the DOR testified that its only contact with Stokes was at his § 341 meeting, and that since then the DOR received his tax returns for the years 2000 forward, but not for 2008. Under cross examination by counsel for the DOR about his 2008 tax returns Stokes testified that their completion is "imminent." Davis testified that Stokes failed to deliver his Quickbooks data to the DOR like he said he would at the § 341 meeting. Stokes testified that his failure to provide his Quickbooks backup data to the DOR as he promised was because he had to redo his tax returns from corporate to individual at Jensen's request. DOR again requested Stokes provide the DOR with his Quickbooks record and he said that he would within a week.

Stokes moved for relief from the stay on June 25, 2009 (Docket No. 58), but to continue the stay of execution in order that he can proceed with his appeal of the Gardners' judgment in Case No. DA 09–0049 in the Montana Supreme Court. Gardners objected and asked that a decision on the motion be deferred until a trustee in chapter 7 has an opportunity to review the judgment, findings of fact and conclusions of law. After a hearing on July 16, 2009, the Court entered an Order (docket No. 67) holding its decision on the motion to lift stay until the UST's motion to convert is heard.

Stokes testified that his real estate taxes remain delinquent, but that his bills are being paid. He testified that he could sell his 6.5 acres for $1.5 million and move his studio, or he could sell everything he owns for $10.7 million and pay off all his creditors.

### CONTENTIONS OF THE PARTIES

The UST moved to convert the case to Chapter 7 because of the numerous errors and omissions in

Stokes Schedules, which Stokes declared that he reviewed and were accurate under penalty of perjury, and based on Stokes' failure to satisfy his burden under § 1112(b)(1) to show that the requested conversion is not in the best interests of creditors and the estate. The UST argues that cause exists to convert the case to Chapter 7, and that it is in the creditors' best interests to have a trustee appointed in Chapter 7 to investigate the nature, extent and value of the Debtor's assets. The UST's supplement argues that the Debtor has not filed any monthly operating reports and did not file amended Schedules [FN10] and SOFA correcting the deficiencies in the originals.

> FN10. Stokes filed his amended Schedules after the UST filed the supplement.

**\*13** Gardners joined the UST's motion to convert, and added that conversion to Chapter 7 is in the creditors' best interests because Stokes stated that his radio station has never made any money and there is no realistic possibility of a reorganization. Todd Gardner testified that they prefer conversion to Chapter 7 because it is the only way they will get paid. In a supplemental brief Gardners argued that the Debtor's plan is a litigation plan, not a reorganization plan, and does not propose any payments to creditors. Boone, et al. file a joinder to the UST's motion for the same reasons as Gardners.

The DOR filed joinder motions and memoranda arguing that Stokes still has not filed his 2008 Montana tax return, that Stokes failed to file monthly reports as required by 11 U.S.C. § 1106(a)(1), § 1107(a), § 704(a)(8) and the UST Chapter 11 Guidelines, and that Stokes failed to timely amend and cure the failures. The IRS filed a joinder to the UST's motion to convert on the grounds that Debtor cannot obtain a confirmable plan without updating many years of corporate and personal tax returns.

Stokes objected to the UST's motion, both while represented by counsel and pro se. Duncan argued that conversion is not in the best interests of

Page 12

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

all creditors because they will not all be paid in a Chapter 7. Stokes objected and moved to dismiss the UST's motion on the grounds the Court lacks jurisdiction because FCC rules forbid transfer of a radio station license without prior written approval which the UST has not obtained.

Stokes' pro se objection blames his attorney for the misfiling of Schedules. He argues that only the Gardners' judgment against him made him bankrupt, and that the UST's only argument for conversion is that his bankruptcy forms were not filled out right. Stokes wants the stay lifted so he can proceed with his appeal of Gardners' default judgment against his dissolved corporation in the Montana Supreme Court, where he is confident that he will prevail. He argues that in addition will prevail on his other litigation against DaHood, Poeschel, and in the condemnation case. Stokes testified that he can work out his dispute with Questa or get refinancing [FN11], or pay it out of his assets. Stokes argued that conversion will not serve anyone's interests, that KGEZ will go dark and that conversion will result in several years of delay. Stokes' objection states he prefers that his bankruptcy be terminated rather than converted to Chapter 7. Stokes' daughter Elizabeth filed an objection to conversion on the grounds that a sale of Debtor's assets in Chapter 7 will not obtain full market value because of lis pendens in other litigation. She argues that the parties can be paid 100% through the condemnation case, and she would appeal a conversion to protect her own assets.

> FN11. When asked where he would get refinancing Stokes answered: "I'll find it."

## DISCUSSION

The Court begins by noting that Stokes is representing himself pro se. In such circumstance courts have a duty to construe pro se pleadings liberally. *Bernhardt v. Los Angeles County,* 339 F.3d 920, 925 (9th Cir.2003). On the other hand, in the Ninth Circuit pro se litigants are not excused from compliance with the rules. *Warrick v. Birdsell,* 278 B.R. 182, 187 (9th Cir.BAP2002); *King v. Atiyeh,*

814 F.2d 565, 567 (9th Cir.1987)("Pro se litigants must follow the same rules of procedure that govern other litigants.").

### I. Jurisdiction.

*14 Regarding Stokes' contention that this Court lacks jurisdiction because the FCC license may not be transferred, a court in *Matter of Smith,* 94 B.R. 220, 221 (Bankr.M.D.Ga.1988) stated:

> Federal law prohibits the transfer of an FCC license or any of the rights thereunder unless application for the transfer is made to or granted by the FCC. An exception to this rule has been made in the case of bankruptcy trustees, however, in order to avoid a conflict between the Bankruptcy Code and FCC regulations. Thus, "[i]n cases of bankruptcy ..., the Commission usually gives its consent to the temporary acquisition of the license by the trustee ..., pending disposition of estate assets." *In re Merkley,* 94 F.C.C.2d 829 (1983); *see also LaRose v. FCC,* 494 F.2d 1145 (D.C.Cir.1974) (the Commission's regular practice is to approve an involuntary assignment of the license to a [trustee] in bankruptcy, who must then find a qualified purchaser).

In *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.,* 550 F.Supp.2d 481 (S.D.N.Y.2008), the court noted that the FCC routinely approves involuntary assignment of licenses where courts had appointed receivers, and it is the receiver's responsibility to comply with 47 U.S.C. S. § 310(d) by seeking FCC's approval of involuntary transfer of a license.

Section 541(a)(1) is broad in scope and includes in the estate all legal or equitable interests of the debtor in property as of the commencement of the case. *Richardson v. Becker (In re Anderson),* 19 Mont. B.R. 404, 406–07 (Bankr.D.Mont.2001), citing *United States v. Whiting Pools, Inc.,* 468 U.S. 198, 205 (1983) (other citations omitted). Section 541(c)(1)(A) provides that a debtor's interest in property becomes property of the estate under § 541(a) notwithstanding any provision in applicable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

nonbankruptcy law that restricts or conditions transfer of such interest by the debtor.

The value of a government issued license can typically be realized through sale, notwithstanding conditions requiring government approval prior to transfer. *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 254 (3rd Cir.2001); *In re Nejberger,* 934 F.3d 1300, 1300–02 (3rd Cir.1991). A FCC-issued radio license was found to constitute property of a debtor's estate under 11 U.S.C. § 541(a) and sold in the course of a bankruptcy auction by the trustee in *Central Arkansas Broadcasting,* 68 F.3d 213, 214 (8th Cir.1995) (per curiam); *Walsh,* 246 F.3d at 254.

Based on the above-cited case law the Court finds no merit in Debtor's contention that this Court lacks jurisdiction to convert the case to Chapter 7 without FCC approval. The Debtor created the estate when he filed his Chapter 11 petition, and the estate includes the FCC radio license under § 541(a). The UST is aware of the requirement for any trustee appointed to proceed accordingly in the FCC [FN12], and Stokes' objections can be raised and decided in that forum.

> FN12. The Court inquired of Jensen at the conclusion of the hearing as to what has been done to preserve the FCC license. Jensen advised the Court that a prospective trustee has inquired with the FCC on how to transfer or preserve an FCC license, and that in a bankruptcy context a station can go dark for a limited period of time in non-user status. Stokes stated that the FCC procedure includes an appeal process and he will appeal any transfer.

**II. Conversion.**

**\*15** Conversion or dismissal is provided for at § 1112(b), which sets forth a nonexclusive list of factors. *In re Shockley,* 15 Mont. B.R. 114, 116 (Bankr.D.Mont.1996); *In re Mechanical Maintenance, Inc.,* 128 B.R. 382 (Bankr.E.D.Pa.1991). Formerly the analysis involved a two-step process,

first to determine whether cause exists to dismiss or convert, and second whether dismissal is in the best interests of creditors and the estate. *In re BTS, Inc.,* 247 B.R. 301, 308–09 (Bankr.N.D.Okla.2000) *(quoting In re Superior Siding & Window, Inc.,* 14 F.3d 240, 242 (4th Cir.1994)); *In re Shockley,* 15 Mont. B.R. at 117 *(quoting Superior Siding).* Section 1112(b) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and now provides:

(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections to not apply, within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

(3) The Court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance [FN13] for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

> FN13. The time limit ceased to apply when the UST filed two motions to continue the hearing on the motion to convert, both of which were granted.

(4) For purposes of this subsection, the term 'cause; includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

*16 (E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

The determination under § 1112(b) rests with the sound discretion of the court. *Pioneer Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortg. Entities),* 264 F.3d 803, 806–07 (9th Cir.2001); *In re Henson,* 289 B.R. 741, 752–53 (Bankr.N.D.Cal.2003); *In re Shockley,* 15 Mont. B.R. at 116; *In re BTS, Inc.,* 247 B.R. at 309. The initial burden of proof is on the moving party. *In re BTS, Inc.,* 247 B.R. at 303.

The UST is required under 28 U.S.C. § 586(a)(3)(D) to take action to ensure that all reports, schedules and fees required to be filed by the debtor are properly and timely filed. The Debtor's duties as a debtor-in-possession are cross referenced at 11 U.S.C. § 1107(a), § 1106(a)(1), and § 704(a)(8), to require a debtor in Chapter 11 to file

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

periodic reports and information as the UST requires. Stokes did not dispute his obligation to file accurate Schedules and SOFA.

Little more needs to be added to the record above about the condition of Stokes' original Schedules and SOFA. Literally millions of dollars of purported assets were omitted from the Schedules, including lawsuits, vehicles and at least one boat. Stokes admitted that his Schedules and SOFA contained numerous errors and omissions, and blames his attorney for the condition of the original Schedules. However, Stokes voluntarily selected Duncan as his attorney of record, and he cannot avoid the consequences of the acts or omissions of his freely-selected attorney. *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 396–97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *In re Casey,* 193 B.R. 942, 949 (Bankr.S.D.Cal.1996).

*17 The UST argues that the condition of the original Schedules and SOFA alone is enough to require conversion to Chapter 7. The Court agrees that the condition of the original Schedules and SOFA is evidence of "cause" under § 1112(b), but finds that additional relevant evidence exists in the record, and amendment of schedules is liberally allowed under F.R.B.P. 1009(a). *In re Michael,* 163 F.3d 526, 529, 17 Mont. B.R. 192, 198 (9th Cir.1998) (citing cases).

Of particular concern is Stokes' testimony regarding his signed declarations on Ex 24, which were signed under penalty of perjury, that he reviewed the Schedules and SOFA and that they were true and correct. His declarations are not truthful. Stokes testified that he was faxed the signature pages and told to sign them and return them, and that he signed the declaration pages and returned them without reviewing the Schedules and SOFA. This Court discussed a debtor's responsibility in completing schedules and statements of financial affairs in *Torgenrud v. Wolcott (In re Wolcott),* 194 B.R. 477, 486 (Bankr.D.Mont.1996):

As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith (In re Smith),* 14 Mont. B.R. 228, 232 (Bankr.D.Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson,* 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring,* 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.,* 153 B.R. 601 (9th Cir.BAP1993), *aff'd mem.,* 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith,* 14 Mont. B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring,* 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers,* 759 F.2d at 753–754.

In the case *sub judice,* Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to conceal property.

The above-quoted language about the Debtor's duty to prepare Schedules and SOFA "carefully, completely, and accurately" applies in a Chapter 11 case as much as in a Chapter 7 case. For Stokes to sign declarations under penalty of perjury stating

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

that he had reviewed the Schedules and SOFA and that their were true and correct, when he had not reviewed them, is inconsistent with his duty and is further evidence of cause under § 1112(b)(4) to convert.

**\*18** Stokes amended his Schedules and SOFA, and while they correct many errors and omissions on the original Schedules, Stokes admitted at the hearing that the Montana DOT's claim is not listed on Schedule F, nor is his alleged claim against Judge Curtis. As before, Stokes signed his declarations under penalty of perjury that he had reviewed the amended Schedules and SOFA and that they were true and correct, but they continue to have errors and omissions.

Rezentes testified that the Debtor has not filed any monthly operating reports which satisfy the UST's Guidelines. Rezentes testified that the financial documents which Stokes filed did not satisfy the UST's requirements, and they were unable to analyze his financial condition. Unexcused failure to satisfy timely any filing or reporting requirement established by statute or rule applicable to a Chapter 11 is "cause" under § 1112(b)(4)(F), and failure to provide information reasonably requested by the UST is a specified "cause" under § 1112(b)(4)(G). Stokes' argument that his failure to properly complete paperwork is not grounds to convert him to Chapter 7 is contrary to those express provision of § 1112(b)(4). Debtor's failure to comply with those subsections is established by Rezentes' testimony that he failed to timely file monthly operating reports in conformity with the UST Guidelines, and that failure constitutes additional cause under § 1112(b)(2) and (b)(4).

Rezentes testified that the Debtor has not made payments of the quarterly UST fees due in the amount of $325, to which the Debtor replied at the hearing that the fees were en route. Given that so many of Stokes' representations on sworn declarations, and regarding tax returns and financial data, turned out not to be true, the Court finds that Stokes failed to pay UST fees, which is grounds for con-

version or dismissal under § 1112(b)(4)(K).

The evidence of Stokes' failure to file state and federal tax returns is a red flag. This Court has long held that it is not in the public interest to allow debtors who fail to undertake their burdens under the Internal Revenue Code by not filing tax returns, to enjoy the benefits of the United States Bankruptcy Code. The IRS and DOR have filed estimated claims based on the Debtor's failure to file his tax returns. At the hearing the evidence showed that Stokes still had not completed his 2008 Montana tax return. When the Court considers Debtor's failure to file his tax returns with the numerous errors and omissions in his Schedules and SOFA, his failure to file monthly operating reports, failure to pay UST fees, and failure to cooperate with the UST in performing his duties, the Court finds and concludes that overwhelming evidence establishes the "cause" identified under § 1112(b)(2) and (b)(4) that is necessary for conversion to chapter 7.

All of the creditors who responded and appeared, save one, including Gardners, Boone, et al., the DOR, and the IRS, joined in the UST's motion to convert. The only creditor who objected was the Debtor's daughter Elizabeth. The joining creditors rejected the Debtor's contentions that conversion would result in delay and insufficient proceeds from a liquidation sale.

**\*19** The question is what is in the best interest of creditors and the estate. *In re Shockley,* 15 Mont. B.R. at 116. The interest of a single creditor with a large enough claim will suffice under the § 1112(b) test. *In re Staff Investment Co.,* 146 B.R. 256, 261 (Bankr.E.D.Cal.1992); *Goodrich v. Lines,* 284 F.2d 874, 877 (9th Cir.1960). The Court notes that the only creditor with a large claim who opposes the UST's motion to convert is Stokes' daughter, who as a relative is an insider as defined at 11 U.S.C. § 101(31)(A)(i), and therefore whose vote cannot be taken into account when determining whether a class that is impaired under a plan has accepted the plan. 11 U.S.C. § 1129(a)(10).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))

In considering the best interest of creditors and the estate, the Court notes the results in the record of Stokes' various litigation, in which several creditors are the opposing parties. Stokes is optimistic in his assessment of his prospects in his appeal of the Gardners' judgment, and his usury claim against Boone, et al., and his claims against DaHood, and in the condemnation case with the City of Kalispell, which the evidence shows has not even reached the stage where Kalispell has made an offer. Stokes is not an attorney, and while he zealously argues his positions, the record of his unsuccessful results in litigation is uniform and speaks for itself. Further, his status as litigant against his creditors is inconsistent with his trustee duties to creditors.

Given those results and the pending appeal and other litigation, and the condition of the Debtor's Schedules and SOFA, this Court finds that the best interests of the creditors and estate clearly are served with conversion to Chapter 7, and appointment of a trustee and qualified and objective counsel to investigate and evaluate the Debtor's assets and lawsuits. A trustee's financial incentive in Chapter 7 promotes a thorough investigation of assets and claims and maximization of the recovery for the estate, and if the trustee determines that a lawsuit or other asset is burdensome or of inconsequential value or benefit to the estate then it may be abandoned to the Debtor under 11 U.S.C. § 554. Based upon the testimony and exhibits admitted at the hearing, the Court finds that the best interests of the creditors and the estate are served by granting the UST's motion to convert to Chapter 7 and for appointment of a Trustee in Chapter 7 to evaluate and administer the estate.

Section 1112(b)(2) requires that conversion or dismissal not be granted, absent unusual circumstances, if the debtor or other party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within applicable reasonable timeframes; and that there were reasonable justifications for the debtor's act or omission and that the act or omission will be cured

within a reasonable period of time. With respect to the Plan, Ex. 26 is Stokes' "Disclosure Statement and Plan of Reorganization." It contains no financial information of the Debtor, and proposes to pay creditors from the condemnation proceedings with Kalispell which the evidence shows, based on Harball's testimony, has not commenced or even progressed to the point that Kalispell has made Stokes an offer under Ex. 3.

*20 Stokes testified that he obtained the form for Ex. 26 from a bankruptcy court site. However, the Debtor cannot solicit acceptance of his Plan unless a written disclosure statement is first approved after notice and a hearing as having "adequate information." 11 U.S.C. § 1125(b). "Adequate information" is defined at § 1125(a)(1) as meaning information of a kind and in sufficient detail that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan. Ex. 26 fails to satisfy the adequate information requirement of § 1125(a)(1) by any measure. It includes no historical or current financial information, and relies entirely on proceeds from a condemnation proceeding which the evidence shows has not commenced. The case commenced on March 4, 2009, and more than six months later no disclosure statement exists that can be approved, and thus no solicitation for acceptance of a plan can be made. All creditors who have appeared oppose the Debtor's reorganization, except for an insider, and thus Debtor's prospects for obtaining a class of claims to accept his plan from among the several defendants in his litigation are unlikely. The Court finds that the Debtor has failed to establish a reasonable likelihood that a plan will be confirmed within a reasonable period of time under § 1112(b)(2)(A).

Based on the testimony and evidence above of the errors and omissions, the Court finds that Debtor has failed to establish under § 1112(b)(2)(B) that a reasonable justification exists for his acts and omissions regarding his Schedules and SOFA, false declarations under penalty of perjury, failure to

Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)
**(Cite as: 2009 WL 3062314 (Bkrtcy.D.Mont.))**

provide monthly operating reports in conformity with the UST Guidelines and failure to pay UST fees. The Debtor was given additional time by the UST, and the Court declines to grant the Debtor any further time to cure his acts and omissions under § 1112(b)(2)(B)(ii).

In sum, this Court concludes that the UST has satisfied its burden of proof to show that cause exists to convert to Chapter 7, and that conversion is in the best interests of creditors and the estate.

### III. Debtor's Motion to Lift Stay.

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion. *In re Delaney–Morin,* 304 B.R. 365, 369–70 (9th Cir.BAP2003); *In re Leisure Corp.,* 234 B.R. 916, 920 (9th Cir.BAP1999); *In re Plummer,* 20 Mont. B.R. 468, 477–78 (Bankr.D.Mont.2003); *Mataya v. Kissinger (In re Kissinger),* 72 F.3d 107, 108–109 (9th Cir.1995). Given the decision above granting the UST's motion to convert the case to Chapter 7, the Court deems it premature to lift the stay to allow the Debtor's appeal of the Gardners' judgment to proceed in the Montana Supreme Court. With conversion of this case, a trustee will be appointed in the Chapter 7 case who must be permitted reasonable time to evaluate the Debtor's appeal along with the other assets and claims. Therefore, the Court exercises its discretion and denies Debtor's motion to lift stay without prejudice at this time.

### CONCLUSIONS OF LAW

*21 1. This Court has original and exclusive jurisdiction in this bankruptcy case.

2. The UST's motion to convert the case to Chapter 7 is a core proceeding under 28 U.S.C. § 157(b)(2).

3. Debtor's motion to lift the stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

4. The UST established cause to convert the case to Chapter 7 under § 1112(b)(2) & (4) for Debtor's numerous errors and omissions in his Schedules and Amended Schedules, Debtor's declaration under penalty of perjury that he had read and reviewed his Schedules when he had not when he signed them, Debtor's unexcused failure to satisfy timely the UST's reporting requirements, Debtor's failure to timely provide information reasonably requested by the UST, Debtor's failure to file monthly operating reports, Debtor's failure to pay quarterly fees to the UST, and Debtor's failure to file state and federal income tax returns for a period of several years.

5. The Debtor failed to establish that a reasonable likelihood exists that a plan will be confirmed within applicable timeframes, and failed to establish that the acts or omissions of the Debtor were reasonably justified and that they will be cured within a reasonable period of time.

6. Conversion of this case to Chapter 7 is in the best interests of creditors and the estate.

7. The Court exercises its discretion under § 362(d) and denies Debtor's motion to modify the stay.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above (1) overruling Debtor's objections and denying Debtor's motion to dismiss, granting the UST's motion to convert and converting this case to a case under Chapter 7; and (2) denying Stokes' motion to modify the stay without prejudice against the trustee who will be appointed in the Chapter 7 case.

Bkrtcy.D.Mont.,2009.
In re Stokes
Not Reported in B.R., 2009 WL 3062314 (Bkrtcy.D.Mont.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit "D"

# Exhibit "D"

Westlaw.

Slip Copy, 2011 WL 1230535 (D.Idaho)
**(Cite as: 2011 WL 1230535 (D.Idaho))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Idaho.
In re Leonard O. WALLACE and Pamela J. Wallace,
Debtors–in–Possession.

BK Case No. 09–20496–TLM.
No. 2:10–CV–113–BLW.
March 30, 2011.

Leonard O. Wallace, Post Falls, ID, pro se.

Pamela J. Wallace, Post Falls, ID, pro se.

Daniel J. Gibbons, Witherspoon Kelley, Spokane, WA, for Appellee.

**ORDER**
B. LYNN WINMILL, District Judge.
**INTRODUCTION**
*1 The Court has before it an appeal by Debtors–in–Possession, Leonard and Pamela Wallace ("Debtors"). For the reasons explained below, the Court will affirm the Bankruptcy Court's dismissal of the case.

**FACTUAL BACKGROUND**
Through negotiations with Norman Hayes, Leonard Wallace agreed to fund development of a patented identification bolus for cattle and other livestock in exchange for an ownership interest in the company purporting to own the patent, MagTrac Bolus, LLC ("MagTrac"). Wallace provided funding over a period of time and acquired a substantial interest in MagTrac. However, the relationship between Wallace and Hayes deteriorated, and Wallace initiated a lawsuit against Hayes, MagTrac, and the remaining members of MagTrac in Montana state court. The dispute went to arbitration in Wyoming.

The arbitrator found that both Hayes and Wallace breached their fiduciary duties toward MagTrac and its members. The arbitrator determined judgment would be entered against Wallace in favor of MagTrac for $2,500,000.00 based in large part on the arbitrator's finding that Wallace attempted to market the identification bolus patent individually and not on behalf of MagTrac. The arbitrator also determined that Wallace would be entitled to judgment against Hayes for various other amounts.

Wallace requested the arbitration award be modified, arguing that issues concerning ownership of the bolus patent, which were not disclosed during the arbitration process, constituted fraud by Hayes. The arbitrator initially stayed its proceedings pending litigation in Wyoming state court over the ownership of the bolus patent. However, prior to the resolution of that litigation, the arbitrator lifted its stay and entered supplemental findings and conclusions affirming its earlier award. Wallace appealed the arbitrator's award, but the Montana courts affirmed the decision.

MagTrac recorded its judgment in California where Debtors own several industrial/commercial rental properties. MagTrac then assigned its judgment against Wallace to the Hayes Creditors. The Hayes Creditors levied on the rents from Debtors' California properties and had the California court appoint a receiver to collect the rents and market those properties for sale in order to satisfy their judgment. The Hayes Creditors also recorded their judgment in Idaho and Washington.

**PROCEDURAL BACKGROUND**
On May 14, 2009, Debtors filed a joint voluntary chapter 11 petition. The Hayes filed a Motion to Dismiss on September 17, 2009. The United States Trustee joined in the Hayes' Motion to Dismiss on November 23,2009. On December 1, 2009, the Bankruptcy Court granted the Hayes' Motion to Dismiss. The Bankruptcy Court entered its Memorandum Decision on January 26, 2010. It entered an Order Granting the Motion to Dismiss on February 1, 2010. Debtors filed a Notice of Appeal on February 16, 2010. The appeal was transferred to this Court after a party filed a timely object to disposition by the Bankruptcy Appellate Panel. The appeal is now fully briefed.

**LEGAL STANDARD**
*2 A Bankruptcy Court's findings of fact are reviewed for clear error and its conclusions of law are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1230535 (D.Idaho)
(Cite as: 2011 WL 1230535 (D.Idaho))

reviewed *de novo. Anastas v. Am. Sav. Bank (In re Anastas),* 94 F.3d 128, 1283 (9th Cir.1996); *see also In re Consolidated Pioneer Mortgage Entities,* 264 F.3d 803, 806 (9th Cir.2001).* The decision to convert a case to Chapter 7 under Section 1112 is within the bankruptcy court's discretion. *In re Consolidated Pioneer Mortgage Entities,* 264 F.3d at 806. "Such a decision will be reversed only if based on an erroneous conclusion of law or when the record contains no evidence on which [the bankruptcy court] rationally could have based that decision." *Id.* at 806–07 (Internal quotation and citation omitted).

## ANALYSIS

Debtors list several grounds for appeal. However, they seem to focus on only three issues: (1) loss or diminution of the estate; (2) gross mismanagement; and (3) unusual circumstances and other considerations. Their other arguments seem wholly without legal analysis or support. The Court will address each of the three main arguments below.

### 1. Loss or Diminution of the Estate

"[S]ubstantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" constitute grounds for dismissal of a Chapter 11 case under Section 1112(b)(4)(A). Here, the Bankruptcy Court explained that Debtors initial filing in May 2009 showed cash on hand amounting to $122,000. By October 2009, Debtors reported cash on hand of only $4,600. (Dkt. 177, pp 8–9).

The Bankruptcy Court found that the Debtors were spending money at a significant rate, but Debtors' monthly reports did not provide adequate information about where the money was going, and more importantly why it was disappearing. (Dkt.177, p. 9). The Bankruptcy Court noted that Debtors had significant living expenses, totaling $71,000 from May to October 2009. (Dkt.177, p. 9). Approximately $48,000 of that is characterized by Debtors as miscellaneous household expenses. (Dkt.177, p. 9). Debtors also incurred post-petition liability by taking loans from entities they control. (Dkt.177, pp. 9–10). Debtors were also losing rental income from their California properties. (Dkt.177, p. 10).

The Bankruptcy Court explained that Debtors showed "no cogent outline of a proposed reorganization or restructure." (Dkt.177, pp. 10–11). Debtors provided no evidence of working with creditors re-

garding a plan to pay the creditors. The Bankruptcy Court explained that "Notwithstanding prebankruptcy arbitration and judgment in favor of MagTrac Bolus, LLC and judicial affirmance of those decisions in the Montana District Court and Supreme Courts," Debtors premised their case upon pursuing their claims against the Hayes. (Dkt.177, p. 11). But Debtors did not provide any evidence as to how they could reduce their monthly expenses. (Dkt.177, p. 10). Accordingly, the Bankruptcy Court concluded that "[o]n the present record, with (1) significant depletion of assets; (2) the large unexplained and poorly justified expenditures; (3) an existing reduction and anticipated future reduction in rental income; and (4) no 'plan' beyond claim litigation, cause exists for dismissal under the standard of Section 1112(b)(4)(A)." (Dkt.177, p. 11).

*3 Debtors' appeal brief does nothing to dispute the Bankruptcy Court's findings and conclusions. Those findings are supported by the record. Moreover, the appeal brief does not identify any error of law by the Bankruptcy Court. Accordingly, the Bankruptcy Court properly dismissed Debtors Chapter 11 case under Section 1112(b)(4) (A).

### 2. Gross Mismanagement

Section 1112(b) (4)(B) provides that a Chapter 11 case may be dismissed due to "gross mismanagement of the estate." The Bankruptcy Court found that Debtors committed several violations of the Bankruptcy Code and Rules. (Dkt.177, p. 14). Specifically, Debtors violated Section 331 by paying over $8,800 in professional fees without court approval, violated Section 364(a)-(c) by obtaining postpetition financing without court approval, and improperly paid approximately $9,900 in prepetition debts. (Dkt.177, pp. 12–14).

Debtors fail to identify any shortcoming in the Bankruptcy Court's findings with respect to these violations. The Bankruptcy Court's findings of fact are again supported by the record. Likewise, Debtors point to no legal error by the Bankruptcy Court. Thus, the Bankruptcy Court did properly dismissed the Debtors' Chapter 11 case under 1112(b)(4)(B).

### 3. Unusual Circumstances and Other Considerations

As explained by the Bankruptcy Court, the Code does not define unusual circumstances. However, courts have determined that it "contemplates condi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1230535 (D.Idaho)
(Cite as: 2011 WL 1230535 (D.Idaho))

tions that are not common in most chapter 11 cases."
*In re Orbit Petroleum, Inc.,* 396 B.R. 145, 148
(Bankr.D.N.M.2008) (*citing In re Fisher, 2008 WL
1775123, at *5 (Bankr.D.Mont.2008).* Such condi-
tions must not only be unusual, they must also
demonstrate that dismissal or conversion is not in the
best interest of creditors and the estate.

Debtors provide no evidence supporting an ex-
ception to dismissal under Section 1112(b)(1) or
(b)(2). Debtors did not raise any specific argument
regarding Section 1112(b)(1) at trial. (Dkt.177, p. 17.)
Those arguments cannot be raised for the first time on
appeal. *In re Am. West Airlines, Inc., 217 F.3d 1161,
1165 (9th Cir.2000).* Moreover, to the extent Debtors'
arguments regarding fraud on the Montana court apply
to Section 1112(b)(1), the Bankruptcy Court rejected
those arguments outright. (Dkt.177, pp. 17–18).
Debtors did not identify any reason why the Bank-
ruptcy Court should not have rejected them.

Debtors fail to identify any other legal error or
mistaken facts with respect to the lack of unusual
circumstances in this case. To the degree they make
arguments that the length of underlying litigation is
somehow an unusual circumstance, they provide the
Court with no legal authority supporting that argu-
ment.

There is also no evidence that Debtors provided
an outline of a reorganization plan to the Bankruptcy
Court. The Bankruptcy Court indicated that it was left
"without form or detail regarding Debtors' future plan
or reorganization." (Dkt.177, p. 20). Attempting to
supply this Court with a plan now is improper. *In re
Am. West Airlines, Inc., 217 F.3d at 1165.*

*4 Finally, Debtors failed to meet their burden of
showing a reasonable justification for their miscon-
duct under Section 1112(b) (2)(B). The Bankruptcy
Court explained that "[o]n the evidence, Debtors have
not demonstrated reasonable justifications for their
mismanagement nor that cure is possible." (Dkt.177,
p. 20.) Debtors' appeal brief points to nothing sug-
gesting that the Bankruptcy Court erred as a matter of
law, or that its findings of fact were not supported by
the record in this regard. Accordingly, the Court will
affirm the Bankruptcy Court's order granting the mo-
tion to dismiss.

**ORDER**

**IT IS ORDERED:**

1. The Bankruptcy Court's Order Granting Mo-
tion to Dismiss Debtors' Chapter 11 Case is AF-
**FIRMED.**

D.Idaho,2011.
In re Wallace
Slip Copy, 2011 WL 1230535 (D.Idaho)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit "E"

# Exhibit "E"

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 252183 (W.D.Wash.)
**(Cite as: 2010 WL 252183 (W.D.Wash.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, W.D. Washington,
at Tacoma.
In re Yoshiko Saito HAINES, Debtor.
Yoshiko Saito Haines, Appellant,
v.
United States of America, Internal Revenue Ser-
vice, Appellee.

No. C09-5423BHS.
Jan. 19, 2010.

West KeySummary**Bankruptcy 51** $\Longleftrightarrow$**3591(2)**

51 Bankruptcy
   51XIV Reorganization
      51XIV(C) Conversion or Dismissal
         51k3591 In General; Grounds in General
            51k3591(2) k. Dismissal or Suspen-
sion. Most Cited Cases
   Cause existed to dismiss the case of Chapter 11
debtor who did not file tax returns for the years
2007 and 2008 despite receiving income in both
years and who failed to file those tax returns during
the 15 months of her bankruptcy. 11 U.S.C.A. §
1112(b)(4)(I).

ORDER

BENJAMIN H. SETTLE, District Judge.

*1 This matter comes before the Court on
Debtor's appeal of an order of the bankruptcy court
(Dkt.1-5). The Court has considered the pleadings
filed in support of and in opposition to the appeal
and the remainder of the file and hereby affirms the
order of the bankruptcy court for the reasons stated
herein.

**I. PROCEDURAL HISTORY**

On March 31, 2008, Debtor Yoshiko Saito
Haines filed a Voluntary Chapter 11 Petition. *In Re
Haines,* Cause No. 08-41390, United Stated Bank-
ruptcy Court, Western District of Washington, Dkt.
1. On April 1, 2008, the United States Trustee filed

a Notice of Appearance as a Creditor. *Id.,* Dkt. 5.

On April 24, 2009, the United States filed a
Motion to Dismiss Chapter 11 Bankruptcy. *Id.,* Dkt.
53.

On June 4, 2009, Debtor filed a Motion for
United States to Disgorge Funds Taken by Illegal
Trespass. *Id.,* Dkt. 66.

On June 19, 2009, the Honorable Paul B.
Snyder, United States Bankruptcy Judge, entered an
order denying Debtor's motion to disgorge funds
and granting the United States' motion to dismiss
the bankruptcy. *Id.,* Dkt. 69 ("Order").

On July 29, 2009, Debtor appealed the order
dismissing her Chapter 11 bankruptcy case. Dkt.
1-5. On October 5, 2009, Appellant filed an open-
ing brief. Dkt. 11. On November 4, 2009, Appellee
responded. Dkt. 12. On November 18, 2009, Appel-
lant replied. Dkt. 13.

**II. FACTUAL BACKGROUND**

Debtor, despite earning significant taxable in-
come, has failed to file individual income tax re-
turns for the 1998 through 2007 tax years. *See, e.g.,*
Dkt. 12, Exhibits 1-12 (Administrative Record
("AR")) at 85. Because Debtor failed to file tax re-
turns, the Internal Revenue Service ("IRS") began
audit examinations, and eventually prepared substi-
tute tax returns for Debtor pursuant to Internal Rev-
enue Code ("IRC"), 26 U.S.C. § 6020(b). AR at 85.
The IRS's audit examinations established over $1.3
million in tax assessments, including penalties and
interest. *Id.* at 88-130 (official IRS Certificates of
Assessment ("Forms 4340") for the 1998 through
2007 tax years).

After the IRS assessed Debtor's taxes via the
substitute returns (and Debtor ignored them), it set
out to collect payment. For example, on August 31,
2005, the IRS sent Debtor a Notice of Intent to
Levy. AR at 85. On September 15, 2005, the IRS
recorded Notices of Federal Tax Liens against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 252183 (W.D.Wash.)
(Cite as: 2010 WL 252183 (W.D.Wash.))

Debtor. *Id. See also* AR 488-90. On June 14, 2007, the IRS then instituted a monthly levy upon the Pension Benefit Guaranty Corporation because Debtor was awarded an interest in her ex-husband's fixed benefit pension plan. AR at 85.

## III. DISCUSSION

### A. Standard of Review

Interpretation of the statutory language and mixed questions of law and fact are subject to de novo review. *Hall-Mark Elecs. Corp. v. Sims ( In re Lee),* 179 B.R. 149, 155 (9th Cir.BAP1995), *aff'd,* 108 F.3d 239 (9th Cir.1997). The bankruptcy court's findings of fact may be overturned if they are clearly erroneous. *Id.*

### B. The Appeal

*\*2* A bankruptcy court may **dismiss** a case if the moving party "establishes **cause.**" 11 U.S.C. § 1112(b)(1). Under the statute, " **cause** " includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," *id.* § 1112(b)(4)(A); "failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief," *id.* § 1112(b)(4)(I); and "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court," *id.* § 1112( b)( 4)( J).

In this case, the bankruptcy court **dismissed** the bankruptcy petition for **cause** under 11 U.S.C. §§ 1112(b)(4)(A), 1112(b)(4) (I), and **1112( b)( 4)( J).** Order at 6-12. The court also **dismissed** the case under *In Re Marsch,* 36 F.3d 825, 828 (9th Cir.1994), for lack of good faith in filing the petition. Order at 12-13. Debtor appeals each of these rulings and argues that (1) she has rehabilitated herself to a taxpayer from a tax defier and (2) a portion of the IRS's claim against her should be offset. *See, generally,* Dkts. 11 and 13. The Court finds Debtor's "rehabilitation" and "offset" arguments irrelevant to the issues on appeal. The Court now turns to the merits of the bankruptcy court's order.

### 1. § 1112(b)(4)(I)

The bankruptcy court found that "the Debtor has not filed tax returns for the years 2007 and 2008, even though she received income in both years." Order at 6. The court also found that the Debtor's assertion that the tax returns would be filed in due course lacked credibility because the Debtor had "been in Chapter 11 bankruptcy for some 15 months and still has not filed the required tax returns." Order at 7. The court then found that the United States had established "that the Debtor has failed to timely file tax returns due after the date of the order of relief." Order at 7. The Court has reviewed the record and none of these findings are clearly erroneous. Before the case may be dismissed, however, Debtor had an opportunity to overcome the failure to file her tax returns.

Under § 1112(b), a debtor may avoid dismissal in certain cases if she meets certain excusable criteria such as "unusual circumstances" or "reasonable justification" for the failure to comply with the bankruptcy code. In this case, the bankruptcy court found that Debtor had failed to submit any fact that would establish an excusable reason for her failure to file her tax returns. Order at 8. The bankruptcy court then concluded that the "United States has established that dismissal is warranted." Order at 8. The Court agrees. Therefore, the Court affirms the bankruptcy court's dismissal of the case for cause under § 1112(b)(4)(I).

### 2. § 1112(b)(4)(A) and (J)

Cause to dismiss a petition may be based on "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" or "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court." 11 U.S.C. § 1112(b) (4)(A) and (J).

*\*3* In this case, the bankruptcy court found that Debtor's estate was subject to continuing loss because the monthly financial statements showed "greater disbursements than receipts." Order at 12. The court also found that there was no liklihood of rehabilitation because Debtor owed more than $2

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 252183 (W.D.Wash.)
(Cite as: 2010 WL 252183 (W.D.Wash.))

million to the IRS for failure to pay taxes for the last ten years. *Id.* at 10-11. With respect to the bankruptcy plan, the court found that, after 15 months in the bankruptcy proceeding, Debtor had "yet to file a disclosure statement and only this month filed a plan." *Id.* at 10. The Court has reviewed the record and none of these findings are clearly erroneous.

Based on these findings, the bankruptcy court concluded that the United States had established additional cause for dismissing Debtor's bankruptcy petition. Order at 12. The Court agrees. Therefore, the Court affirms the bankruptcy court's dismissal of the case for cause under § 1112(b)(4)(A) and (J).

### 3. Lack of Good Faith

The Ninth Circuit has recognized that a lack of good faith in filing a Chapter 11 petition is cause for dismissal of the petition. *In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994). "The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." *Id.* (quoting *In re Arnold,* 806 F.2d 937, 939 (9th Cir.1986)).

In this case, the bankruptcy court found as follows:

The facts before this Court establish that the only possible reason for the Debtor to file this Chapter 11 was to avoid paying her outstanding federal tax obligation. Only two proofs of claim have been filed in this case, one by Capital One Bank for a mere $1,228.83, and the other by the Internal Revenue Service for approximately $2 million.

Since filing bankruptcy in March 2008, the only actions taken by the Debtor in this case have been her numerous and duplicative efforts to invalidate the IRS claim and further delay paying taxes.

Despite being in bankruptcy court for 15

months, the Debtor has not filed a disclosure statement and until this month, has not filed a plan. The plan, however, merely sets forth allegations and arguments already considered and rejected by this Court and the United States District Court in the debtor's adversary proceeding. The United States characterizes the debtor's arguments as typically tax defier arguments that no court has ever endorsed.

Additionally, the Debtor has chosen to pursue this case and her litigation against the United States without the assistance of an attorney, even though she has the means to hire one. Thus, through protracted litigation and delayed payment, all of the debtor's actions have been at the expense of the primary creditor in this case, the United States.

Order at 13. The Court has reviewed the record and these findings are not clearly erroneous.

The bankruptcy court concluded that the "United States has established [that] the Debtor lacks good faith in filing of the Chapter 11 case." Order at 14. The Court agrees. Therefore, the Court affirms the bankruptcy court's dismissal of the case for lack of good faith.

### 4. Debtor's Motions

*4 Debtor filed a motion to stay the bankruptcy pending the result of an appeal in a related adversarial matter and a motion to disgorge funds taken by illegal trespass. The Court has reviewed the motions and the record and finds that both motions are without merit. Therefore, the Court affirms the bankruptcy court's denial of both motions.

### IV. ORDER

Therefore, the bankruptcy court's Order of Dismissal is **AFFIRMED.**

W.D.Wash.,2010.
In re Haines
Not Reported in F.Supp.2d, 2010 WL 252183 (W.D.Wash.)

Not Reported in F.Supp.2d, 2010 WL 252183 (W.D.Wash.)
**(Cite as: 2010 WL 252183 (W.D.Wash.))**

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**725 South Figueroa Street, Suite 2600, Los Angeles, California 90017-1574**

A true and correct copy of the foregoing document described as:
**Motion to Dismiss Debtor's Chapter 11 Bankruptcy Case or, in the Alternative, Convert to Chapter 7; Memorandum of Points and Authorities and Declarations of Jack Arutyunyan and Sam Lor in Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.**    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 29, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒    Service information continued on attached page

**II.**    **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **July 29, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒    Service information continued on attached page

**III.**    **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 29, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed. **Upon filing I will be giving a field document to a Court delivery service consistent with our normal business practice, with instructions to deliver the copy to the bin outside the suite (Court Manual Appendix F), as follows:**

☒    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| July 29 2011 | Carol Fusilier | _Carol Fusilier_ |
| _Date_ | _Type Name_ | _Signature_ |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_August 2010_                                                 **F.9013-3.1.PROOF.OF.SERVICE**

## ADDITIONAL SERVICE INFORMATION

**I.**   **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| Attorney | Counsel For | Email |
|---|---|---|
| Michael J. Berger | Albert Cohen Family Trust | michael.berger@bankruptcypower.com |
| Louis J. Esbin | Albert Cohen Family Trust | esbinlaw@sbcglobal.net |
| Stephen F. Biegenzahn | BH Mall, LLC | efile@sfblaw.com |
| Daniel H. Reiss | Ebrahim & Parichehr Kashani | dhr@lnbyb.com |
| Alan W. Forsley | Shahla Rahbar | awf@fredmanlieberman.com |
| Helen R. Frazer | Weber International, Inc. | hfrazer@aalrr.com |

United States Trustee (LA) – ustpregion16.la.ecf@usdoj.gov

Melanie Scott – melanie.scott@usdoj.gov

Queenie K. Ng – queenie.k.ng@usdoj.gov

**II.**   **SERVED BY U.S. MAIL OR OVERNIGHT MAIL:**

**Debtor**
BH Mall, LLC
11661 San Vicente Blvd #904
Los Angeles, CA 90049

**Debtor's Counsel**
Stephen F. Biegenzahn
611 West 6th Street, Suite 850
Los Angeles, CA 90017

**Creditors and Interested Parties**
Soloman Aghai
c/o Sima G. Aghai
Law Offices of Sima G. Aghai
9121 Bolsa Avenue, Suite 202
Westminster, CA 92683

Soloman Aghai
c/o Sima G. Aghai
Law Offices of Sima G. Aghai
1200 N. Main Street #620
Santa Ana, CA 92701-3633

Mr. and Mrs. Soloman Aghi
121 North Oakhurst Drive
Beverly Hills, CA 90210-5504

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F.9013-3.1.PROOF.OF.SERVICE**

BB Architects, Inc.
c/o Michelle R. Generaux
Murtaugh Meyer Nelson & Treglia LLP
2603 Main Street, 9th Floor
Irvine, CA 92614-6232

BB Architects, Inc.
1590 South Coast Highway Suite 18
Laguna Beach, CA 92651-3257

Kern County Treasurer & Tax Collection Office
Attn: Bankruptcy Division
P.O. Box 579
Bakersfield, CA 93302-0579

Mary Nassimi
c/o Sima G. Aghai
Law Offices of Sima G. Aghai
9121 Bolsa Avenue, Suite 202
Westminster, CA 92683

Mary Nassimi
c/o Sima G. Aghai
Law Offices of Sima G. Aghai
1200 N. Main Street #620
Santa Ana, CA 92701-3633

Mary Nassimi
c/o Brian J. Jacobs
433 North Camden Drive, Suite 600
Beverly Hills, CA 90210

Albert Cohen Family Trust
c/o Michael Jay Berger
9454 Wilshire Blvd, 6th Floor
Beverly Hills, CA 90212-2929

Albert Cohen Family Trust
c/o Louis J. Esbin
25129 The Old Road Suite 114
Stevenson Ranch, CA 91381-2273

Albert Cohen Family Trust
c/o Albert Cohen, Trustee
P.O. Box 241212
Los Angeles, CA 90024-1212

Ebrahim & Parichehr Kashani
c/o Daniel H. Reiss
10250 Constellation Blvd, Suite 1700
Los Angeles, CA 90067

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F.9013-3.1.PROOF.OF.SERVICE**

79

Shahla Rahbar
c/o Alan W. Forsley
1875 Century Park East, Suite 2200
Los Angeles, CA 90067

Weber International, Inc.
c/o Helen R. Frazer
Atkinson Andelson Loya Ruud & Romo
17871 Park Plaza Drive, Suite 200
Cerritos, CA 90703

Weber International, Inc.
c/o Atkinson, Andelson, Loya, Ruud & Rom
12800 Center Court Drive, Suite 300
Cerritos, CA 90703

Weber International
1314 California Avenue, Suite 3
Santa Monica, CA 90403-4219

Securities & Exchange Commission
5670 Wilshire Avenue, 11th Floor
Los Angeles, CA 90036-5627

L.A. County Tax Collector
Bankruptcy Unit
2615 S. Grand
Los Angeles, CA 90007-2608

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Los Angeles City Clerk
P.O. Box 53200
Los Angeles, CA 90053-0200

ARCHITECTS INC
1590 SOUTH COAST HWY STE 18
LAGUNA BEACH. CA 92651

CARRIER CORP
ATTN JOYCE KUPPEL
PO BOX 4808 BLDG TR-5
SYRACUSE. NY 13221-4808

FRANCHISE TAX BOARD
BANKRUPTCY SECTION
PO BOX 2925
SACRAMENTO, CA 95812

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS: A-340
PO BOX 2952
SACRAMENTO, CA 95812-2952

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*

**F.9013-3.1.PROOF.OF.SERVICE**

JOHNSON CONTROLS INC
PO BOX 33129
LOUISVIILE. KY 40232

JOHNSON CONTROLS INC
ATTN: BRIAN WilDERMAN M-72
507 E MICHIGAN ST
MILWAUKEE, WI 53202-5211

KSM ARCH 200
4660 AMERICAN AVE
BAKERSFIELD, CA 93309-4068

M&S SECURITY SERVICES INC
2900 L STREET
BAKERSFIELD, CA 93301-2351

MCG ARCHITECTURE
ROBERT H. STELLWAGEN JR., ESQ.
1100 EL CENTRO ST
SOUTH PASADENA. CA 91030-5213

MR AND MRS EBRAHIM KASHANI
1221 HOLMBY AVENUE
LOS ANGELES. CA 90024

MR AND MRS SOLOMON AGHI
121 N OAKHURST DR
BEVERLY HILLS. CA 90210

MR MARY NASSIMI
902 GRETNA GREEN WAY
LOS ANGELES, CA 90049-5835

MRS SHALAH RAHBAR
C/O MR DAGHIGHIAN
433 N CAMDEN DR 400
BEVERLY HillS, CA 90210-4408

MS MANII Y YAFEH
8125 CAMINITO MAILORCA
LA JOLLA. CA 92037-2916

MS SECURITY
BRANDON HOLLADAY
1901 TRUXTUN AVE
BAKERSFIELD, CA 93309

PACIFIC GAS AND ELECTRIC
PO BOX 997300
SACRAMENTO, CA 95899

PACIFIC GAS AND ELECTRIC
PO BOX 241212
LOS ANGELES. CA 90024

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F.9013-3.1.PROOF.OF.SERVICE**

PACIFIC GAS AND ELECTRIC COMPANY
BARBARA GREN.
BANKRUPTCY UNIT
PO BOX 8329
STOCKTON, CA 95208

STEVE CRIBB
700 LEISURE LANE
SACRAMENTO. CA 95814

STEVE SOKOL
23586 CALABASAS RD
CALABASAS. CA 91302

TED TURF
5500 MING AVE 375
BAKERSFIELD. CA 93309-9121

VACUSWEEP
PO BOX 3250
BAKERSFIELD. CA 93385

VOLT SERVICES CORPORATION
C/O JONATHAN NEIL & ASSOCIATES INC
PO BOX 7000
TARZANA, CA 91357-7000

III.   **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL:**

The Honorable Thomas B. Donovan
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Bin Outside of Suite 1352
Los Angeles, CA 90012-3332

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*

**F.9013-3.1.PROOF.OF.SERVICE**